# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| STEVE PAPPAS, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-2800 (RC) |
| | : | | |
| v. | : | Re Document No.: | 19 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

Plaintiffs Steve Pappas, Tawana Lindsay, Nichole Mathies, and Malachi Malik, former employees of the District of Columbia Metropolitan Police Department ("MPD"), brought this class action against MPD, the District of Columbia, and Peter Newsham in his official capacity as Chief of Police of the MPD (collectively, the "Defendants"), challenging the MPD's practice of requiring employees who spend 172 cumulative days within any 24-month period at less than full-duty status to take disability retirement, without offering reasonable accommodations through reassignment, job restructuring, or extended leave. They argue this policy violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.,* and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C §§ 794, *et. seq.* Mr. Pappas also alleges that the MPD made improper medical inquiries and subjected him to improper medical examinations, in violation of the same statutes. Defendants have moved to dismiss the complaint in its entirety, arguing that (1) Ms. Lindsay, Ms. Mathies, and Mr. Malik have failed to exhaust their administrative remedies as to their ADA claims, (2) that Ms. Lindsay, Ms. Mathies, and Mr. Malik's Section 504 claims are barred by the applicable statute of limitations, (3) that all

Plaintiffs have failed to plead a failure to accommodate claim under the ADA or Section 504, and (4) that Mr. Pappas has failed to state a claim for improper medical inquiries. The Court finds that due to the doctrine of vicarious exhaustion, only Mr. Malik has failed to exhaust his administrative remedies regarding his ADA claims, but that Ms. Lindsay, Ms. Mathies, and Mr. Malik's Section 504 claims are all barred by the applicable statute of limitations.  The remaining failure to accommodate claims—Mr. Pappas's claims under both the ADA and Section 504 and Ms. Lindsay and Ms. Mathies's claims under the ADA—survive this motion to dismiss, when given (as required) all reasonable inferences in Plaintiffs' favor.  But because Mr. Pappas has not alleged sufficient facts to plausibly infer that he was subjected to improper medical inquiries given that the inquiries in question were job-related, the Court will also grant the motion to dismiss his improper medical inquiries claims under the ADA and Section 504.

## II.  FACTUAL BACKGROUND[1]

### A.  Plaintiffs' Background and Employment at MPD

Plaintiffs Mr. Pappas, Ms. Lindsay, Ms. Mathies, and Mr. Malik are all former MPD officers who developed medical conditions that caused them to go on leave or be moved to limited duty roles.  Am. Compl. ¶¶ 21–23, 30–32, 37–41, 45–49, ECF No. 8.  They allege that pursuant to MPD General Order 100.11.L, they were required to take involuntary disability retirement after accruing 172 days on sick leave or limited-duty status within a 24-month period for "any disability that occurs outside the performance of duty."[2]  *Id.* ¶ 54.  Under this policy

---

[1] On a motion to dismiss for failure to state a claim, the Court accepts as true the factual allegations in the complaint and construes them liberally in the Plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

[2] Plaintiffs posit that the policy is somewhat varied for injuries that occur within the performance of duty, noting that "[w]here the officer's disability occurs during the performance of duty, MPD may authorize additional time if the individual's prognosis is that he or she will

("Forced Retirement Policy"), MPD does not allow any possibility of reassignment, job restructuring or extended leave. *Id.*  Disability retirement is mandatory "regardless of whether the medical prognosis is that a member will be able to perform in a full duty status after reaching maximum medical improvement." *Id.*  Plaintiffs assert that this policy violates both the ADA and Section 504. *Id.* ¶ 4.

While employed as an MPD officer in 2013, Mr. Pappas developed congestive heart failure and was subsequently assigned to a limited-duty position. *Id.* ¶¶ 21, 23.  During his limited duty assignment, Mr. Pappas was periodically required to provide medical records of his ongoing treatment, and MPD also communicated directly with his treating physicians. *Id.* ¶ 24. Per MPD policy, on March 6, 2015, he was required to take disability retirement after he accrued 172 work days within a two-year period at limited-duty status. *Id.* ¶¶ 26–27.  This occurred even though Mr. Pappas had a doctor's report from October 17, 2014 that stated "he was hopeful" that Mr. Pappas would fully recover by April 17, 2015. *Id.* ¶ 27.  MPD refused to accommodate Mr. Pappas by either "restructuring his position, authorizing additional leave, or permitting him to continue in a limited duty position." *Id.*  While on limited duty, Mr. Pappas applied for an open civilian position at MPD, but despite being qualified for the position, he did not receive an interview. *Id.* ¶ 25.  MPD also did not attempt to engage in efforts to determine if Mr. Pappas was qualified for any vacant positions in the MPD, despite vacant positions for which he was qualified. *Id.* ¶ 28–29.

In September 2014, Ms. Lindsay began experiencing severe foot and ankle pain such that her podiatrist required her to wear an ambulatory walking boot. *Id.*  ¶¶ 30–31.  As a result, MPD

---

eventually be able to perform the full duties of their position, but there is still no possibility of reassignment or job restructuring."  Am. Compl. ¶ 54.

placed her on limited duty.  *Id.* ¶ 31.  Four months later, Ms. Lindsay had foot and ankle surgery

in order to repair her fallen arch.  *Id.* ¶ 32.  From the date of her surgery on February 24, 2015

through April 28, 2015, she took sick leave to recover from her surgery.  *Id.*  She returned to

limited duty on April 28, 2015.  *Id.*  On December 7, 2015, MPD required that Ms. Lindsay take

disability retirement after she reached the 172-day limit for combined sick leave or being on a

limited duty assignment.  *Id.* ¶ 34.  She alleges that her retirement was required despite the fact

that she had a note from her physician indicating that she would fully recover within six to

twelve months after her surgery.  *Id.* ¶ 33.  MPD denied Ms. Lindsay's request to postpone her

disability retirement hearing for six months, which would have allowed the hearing to occur one-

year after her surgery, and by the time that, according to her doctor, she was expected to be able

to return to full duty.  *Id.* ¶¶ 33–34.  Ms. Lindsay also alleges that despite the availability of

vacant positions within MPD for which she was qualified during this period she was on limited

duty, "MPD did not . . . make a reasonable effort to reassign [her] to any vacant position or

provide other reasonable accommodations."  *Id.* ¶¶ 35–36.

Ms. Mathies injured her ankle while on duty as an MPD officer on August 4, 2014.  *Id.* ¶

37.  She was diagnosed as having suffered a "high ankle sprain" by MPD doctors who

recommended physical therapy.  *Id.* ¶ 38.  In the meantime, Ms. Mathies was placed on sick

leave.  *Id.*  One month later, an MRI showed that Ms. Mathies would need surgery, which she

underwent first on October 18, 2014 and then also completed a follow-up procedure on June 25,

2015.  *Id.* ¶¶ 39–40.  After her surgeries, MPD did not offer Ms. Mathies light duty or any other

accommodation, such as by restructuring her position, authorizing additional leave, or permitting

her to continue in a limited duty position.  *Id.* ¶ 40, 42.  She was involuntarily retired on October

23, 2015, after she reached the 172-day limit for combined sick leave and limited duty

assignment. *See id.* ¶ 41.  Her disability retirement occurred despite the fact that Ms. Mathies's

doctors believed she could return to active duty "six to twelve months after a third surgery." *Id.*

¶ 41.  Ms. Mathies also alleges that despite the availability of vacant positions within MPD for

which she was qualified during the period she was on limited duty, "MPD did not . . . make a

reasonable effort to reassign [her] to any vacant position or provide other reasonable

accommodations." *Id*. ¶¶ 43–44.

 Mr. Malik experienced a back injury in June of 2016, while on duty at a community

outreach event. *Id.* ¶ 45.  He later underwent back surgery as a result, and remained on sick

leave until February or March of 2017, when he returned to work in a limited-duty capacity. *Id.*

¶ 46.  However, this injury aggravated an underlying heart condition, and as a result MPD

cardiologists determined he needed a defibrillator. *Id.*  Mr. Malik was informed that "after the

defibrillator was installed, he would no longer be eligible to work for MPD." *Id*. ¶ 47.  He had

the defibrillator surgery in September 2017, and never returned to work. *Id*. ¶ 48.  Mr. Malik

was involuntarily retired on June 25, 2018. *Id.* ¶ 49.  He alleges this action was made expressly

on the basis of his disability, despite the fact that his doctors predicted he would fully recover

from the heart surgery. *Id.*  He also claims that MPD "made no individualized inquiry into

whether [he] could perform the essential functions of his job after the surgery" and that there was

"no basis to believe" "[he] could not fully perform the scope of his position as a Police Officer."

*Id*. ¶ 51.  He also states that MPD did not involuntarily retire another police officer who had a

defibrillator. *Id.*  Like the other Plaintiffs, MPD refused to accommodate Mr. Malik by

restructuring his position, authorizing additional leave, or permitting him to continue in a limited

duty position, and made no reasonable effort to reassign Mr. Malik to any vacant position—of

which there were some available for which Mr. Malik was qualified— or make other reasonable accommodations. *Id*. ¶¶ 50, 52–53.

Plaintiffs also allege that throughout their employment with MPD they were subject to two other MPD policies and practices, in addition to MPD General Order 100.11.L, "which violated the ADA and Section 504." *Id*. ¶¶ 54–56. MPD General Order 100.11.V.B. required "law enforcement personnel to report to the Police and Fire Clinic for 'medical evaluation' whenever they experience any 'off-duty injury/illness.'" *Id*. ¶ 55. MPD General Order 100.11.V.N.1 required all law enforcement personnel to "provide copies of their medical records from their private physicians upon request" to the Police and Fire Clinic, which included "lab reports, surgical reports, a diagnosis and prognosis of medical condition and any other information as deemed necessary." *Id*. ¶ 56. Failure to comply could result in disciplinary action. *Id*.

### B. Procedural History

Mr. Pappas filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 5, 2015. *See id*. ¶ 57. On August 10, 2016, the EEOC issued a determination letter that referred Mr. Pappas's claim to the U.S. Department of Justice ("DOJ"), finding that there was "cause to believe that by [MPD's] actions and through its policies, [MPD] had violated the ADA rights of Mr. Pappas and a class of similarly situated individuals." *Id.*; *see also* Pls.' Mem. Opp'n Defs.' Mot. Dismiss Pls.' Am. Compl. ("Pls.' Opp'n"), Ex. A ("Pappas EEOC Reasonable Cause Determination"), ECF No. 21-2.[3] On June

---

[3] Mr. Pappas's EEOC Reasonable Cause Determination and EEOC Charge, *see* Defs.' Mot. Dismiss, Ex. B ("EEOC Charge"), ECF No. 19-3, can be evaluated by the Court on this motion to dismiss due to their status as judicially noticeable public records. *See Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 264, 272 (D.D.C. 2011) (noting that on review of a motion to

21, 2019, the DOJ issued Mr. Pappas a right to sue letter for his claim.  *See* Am. Compl. ¶ 57.

Mr. Pappas filed suit on September 19, 2019.  *Id.*  An amended complaint was filed by Mr.

Pappas, along with Ms. Lindsay, Ms. Mathies, and Mr. Malik on December 12, 2019.  *Id.*

Defendants have now moved to dismiss the entire complaint.  *See* Defs.' Mem. of P. & A. Supp.

of Defs.' Mot. Dismiss Pls.' Am. Compl. ("Defs.' Mem. Supp."), ECF No. 19-1.  Plaintiffs have

filed an opposition, *see* Pls.' Mem. Opp'n Defs.' Mot. Dismiss Pls.' Am. Compl. ("Pls.'

Opp'n"), ECF No. 21, and Defendants have filed their reply, *see* Defs.' Reply Supp. Mot.

Dismiss Pls.' Am. Compl. ("Defs.' Reply"), ECF No. 22.  The motion is now ripe for

consideration.

### III.  LEGAL STANDARD

To prevail on a motion to dismiss for failure to state a claim, a plaintiff need only provide

a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair

notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v.

Twombly,* 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*,

355 U.S. 41, 47 (1957)).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's

likelihood of success on the merits, but rather "tests the legal sufficiency of a complaint" by

asking whether the plaintiff has properly stated a claim for which relief can be granted.

*Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In considering such a motion, the

complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable

inferences derived from the facts alleged."  *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173

(D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

---

dismiss, a court "may consider an EEOC complaint and Notice of Charge . . . because such
records are public documents of which a court may take judicial notice.") (alternations and
quotations omitted).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.  Additionally, "[i]f the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim . . ." *Jones v. Bock*, 549 U.S. 199, 215 (2007).

"In determining whether a complaint fails to state a claim, [the Court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Schl.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  In employment discrimination cases, courts may, and often do, take judicial notice of EEOC charges and EEOC decisions. *See, e.g., Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018).

## IV.  ANALYSIS

Defendants have moved to dismiss the Plaintiffs' entire Amended Complaint for failure to state a claim.  They argue that Ms. Lindsay, Ms. Mathies and Mr. Malik's ADA claims fail because they have not exhausted their administrative remedies, *see* Defs.' Mem. Supp. 8–13, that the pertinent statute of limitation bars Ms. Lindsay, Ms. Mathies, and Mr. Malik's claims under

Section 504, *see id.* at 13–16, that Plaintiffs' failure to accommodate claims under the ADA and

Section 504 must be dismissed because Plaintiffs have not sufficiently stated a claim, *see id.* at

17–26, and that Mr. Pappas's unlawful medical inquires claims also fail because the only alleged

inquiries were job-related, and accordingly are not actionable under the ADA or Section 504, *see*

*id.* 26–29.  The Court reviews each argument in turn.

### A.  Ms. Lindsay and Ms. Mathies Properly Exhausted their Administrative Remedies under the ADA, While Mr. Malik Did Not

First, the Court addresses Defendants' argument that Ms. Lindsay, Ms. Mathies, and Mr.

Malik cannot proceed on their ADA claims because they failed to exhaust their administrative

remedies by filing a discrimination charge with the EEOC, as is required under the ADA.  Defs.'

Mem. Supp. at 8.  Plaintiffs do not dispute that Mr. Pappas is the only plaintiff to have filed a

discrimination charge with the EEOC.  Pls.' Opp'n at 4.  However, they contend that the other

plaintiffs' claims can proceed under the doctrine of vicarious exhaustion, which allows parties

who did not file a charge with the EEOC to "piggy-back" on a similar filed charge, such as Mr.

Pappas's EEOC complaint here, and be deemed "vicariously" exhausted.  *Id.*  Defendants

counter that vicarious exhaustion "does not apply here."  Defs.' Mem. Supp. at 9.  The Court

agrees in part and disagrees in part.  Specifically, as explained below, while the Court finds that

Ms. Lindsay and Ms. Mathies have timely exhausted their administrative remedies through the

application of vicarious exhaustion, due to factual differences underlying his claim, Mr. Malik

may not "piggy-back" on the administrative exhaustion of Mr. Pappas at this time.  Accordingly,

his ADA claims are dismissed.

Generally, plaintiffs suing under the ADA in federal court "must exhaust their

administrative remedies by filing an EEOC charge and giving [the relevant] agency a chance to

act on it." *Marshall v. Fed. Express Corp.*, 130 F. 3d 1095, 1098 (D.C. Cir. 1997).[4] "The

purpose of the administrative exhaustion doctrine is to afford the agency an opportunity to

resolve the matter internally and to avoid unnecessarily burdening the courts." *Peters*, 873 F.

Supp. at 180 (citing *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011) (alternation

omitted)).

The vicarious exhaustion exception, however, "allows non-filing parties to join the suit of

another similarly situated plaintiff who did file an administrative complaint against the same

defendant." *Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 804 (D.C. Cir. 2010). Vicarious

exhaustion is available only to parties whose claims are "so similar to those asserted by the

original plaintiff that no purpose would be served by requiring them to file independent charges."

*Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 63 (D.D.C. 2011) (quoting *Brooks*, 606 F.3d at

807); *see also Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C. Cir. 1981) ("[w]here the two claims

are so similar that it can fairly be said that no conciliatory purpose would be served by filing

separate EEOC charges, then it would be wasteful, if not vain, to require separate EEOC

filings"). The purported similarity of the claims in question must be "evaluated for whether the

original filing performs the principal notice function of the EEOC filings requirement . . ." *Byrd,*

807 F. Supp. 2d at 63. Thus, in order for vicarious exhaustion to apply, the original EEOC

charge must: "(1) put the employer-defendant on notice of all charges by the similarly situated

---

[4] Generally, failure to exhaust administrative remedies under the ADA is an affirmative
defense, meaning the defendant typically bears the burden of pleading and proving lack of
exhaustion. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). However, an
exception exists where in response to a motion to dismiss, plaintiffs, as the relevant Plaintiffs
have done here, concede they have failed to exhaust their administrative remedies and offer a
legal justification to excuse the failure. *See Peters v. District of Columbia,* 873 F. Supp. 2d 158,
182 n. 21 (D.D.C. 2012). The Court is accordingly allowed to assess the "viability of [the
proffered] theory on a 12(b)(6) motion." *Id.*

plaintiff, and (2) provide the employer and the EEOC with an opportunity for administrative

consolidation and resolution." *Id.* (citing *Foster*, 655 F.2d at 1322).

Defendants argue that the facts alleged by Mr. Pappas in his EEOC Charge, "stand in

contrast to the allegations raised by the other three plaintiffs . . . making it unlikely" that his

charge is similar enough to provide adequate notice for vicarious exhaustion to apply to the other

plaintiffs.  Defs.' Mem. Supp. at 11.  Focusing first on the factual and legal claims raised by Ms.

Lindsay and Ms. Mathies, Defendants catalog certain differences between their claims of

discrimination and Mr. Pappas's EEOC complaint.  Namely, Defendants attempt to distinguish

the claims on the basis that (1) Mr. Pappas did not suffer his injury while in the performance of

duty, while Ms. Mathies did, (2) that Mr. Pappas had an estimated recovery time of six months,

while Ms. Lindsay and Ms. Mathies had a longer recovery period of six to twelve months, and

(3) Mr. Pappas applied for another position while on limited duty while the other plaintiffs did

not.  Defs.' Mem. Supp. at 12.  Defendants try to argue that these differences render the instant

case distinct from cases where "multiple plaintiffs' claims arose from the same allegedly

discriminatory practice presented to . . . the EEOC." *Id.* at 13.  But that is precisely what has

occurred here.  Mr. Pappas, Ms. Lindsay, and Ms. Mathies's claims all arose from the same

allegedly discriminatory mechanism—*i.e.*, the MPD's Forced Retirement Policy.  Mr. Pappas's

filing provided the required notice for vicarious exhaustion to be invoked, as it alerted the EEOC

to MPD's unlawful Forced Retirement Policy and its standardized application to both Mr. Pappas

and other officers and provided them an opportunity for resolution. *See, e.g.*, *Brooks*, 606 F.3d

at 804.  Consequently, it is of no matter that the "specific circumstances giving rise to the

grievances of each of the plaintiffs [] are distinguishable," because "each [Plaintiff] plans to

prove [their] allegations by demonstrating the same thing: a pervasive 'pattern and practice' of []

discrimination." *Cook v. Boorstin,* 763 F.2d 1462, 1466 (D.C. Cir. 1985) (applying vicarious

exhaustion to employee's claims challenging in part employer's policy of using "unvalidated

tests" in promotion process).

A closer examination of the relevant cases—including even those cited in support of

Defendants' argument—reinforces that Ms. Lindsay and Ms. Mathies's claims qualify for

vicarious exhaustion.  Defendants correctly note that courts in this Circuit have declined to apply

vicarious exhaustion in cases where plaintiffs would have to "prove different sets of facts in

order to prevail on their specific . . . claims." *Byrd*, 807 F. Supp. 2d at 64; *see also Peters*, 873

F. Supp. 2d at 184 (same).  But the different facts at issue that precluded the application of

vicarious exhaustion are of a different nature than the allegations in this case.  For example, the

plaintiffs in *Peters* alleged a host of "different bases for discrimination and different kinds of

mistreatment," and the various types of discrimination claimed—ageism, sexism, racism— was

so varied that the different plaintiffs even contradicted each other's claims.  *Peters*, 873 F. Supp

2d at 184.  No "different sets of facts" of this nature are at issue here.  Rather, the instant case is,

as the court in *Byrd* noted, precisely the situation in which vicarious exhaustion is "typically

applied"—as it is one where "discrimination was an integral part of an employer's practices."

*Byrd*, 807 F. Supp. 2d at 64*; see also Foster,* 655 F.2d at 1323 (applying vicarious exhaustion

where plaintiffs "alleged facts demonstrating they. . . had received the same discriminatory

treatment" that "constitutes the basis for both [plaintiffs] claim for relief").  The Forced

Retirement Policy was such an integral part of the MPD's employment practices that it was

codified into a formal department policy.  Vicarious exhaustion is particularly appropriate in this

sort of circumstance.  *See*, *e.g.*, *Davis v. District of Columbia*, 246 F. Supp. 3d 367, 389 (D.D.C.

2017), *aff'd in part, rev'd in part and remanded*, 925 F.3d 1240 (D.C. Cir. 2019) (determining

that where an EEOC charge challenges an employer's policy, it "thus exhaust[s] a distinct claim of discrimination based on that policy," even for non-filing parties); *Moore v. Chertoff*, 437 F. Supp. 2d 156, 159, 165 (D.D.C. 2006) (allowing application of vicarious exhaustion to plaintiffs in class action suit challenging the Secret Service's allegedly discriminatory personnel policies, practices, and procedures); *Contreras v. Ridge*, 305 F. Supp. 2d 126, 133 (D.D.C. 2004) (applying vicarious exhaustion to class claims challenging Custom Service's allegedly discriminatory policies and programs).  Further, the primary purpose of the exhaustion doctrine—notice to the MPD of the allegedly discriminatory act—was accomplished by Mr. Pappas's EEOC Charge which detailed his belief that his firing pursuant to the Forced Retirement Policy constituted discrimination on the basis of his disability.  EEOC Charge at 2. Because Ms. Lindsay and Ms. Mathies challenge the same MPD policy, vicarious exhaustion is appropriate for their claims.

Defendants make a more persuasive argument when they turn their attention to the dissimilarities between Mr. Pappas's and Mr. Malik's discrimination claims.  Unlike Mr. Pappas and the other plaintiffs, Mr. Malik does not allege that he was subjected to involuntary retirement under the Forced Retirement Policy.  His claims related to his termination describe only that after he was required for health reasons to receive a defibrillator, he "never returned to work," and was involuntarily retired . . . on the basis of disability," nine months after his defibrillator was installed.  Am. Compl. ¶¶ 46–49.  Critically, he does not plead that he was forced to take disability retirement after reaching the 172-day threshold pursuant to the MPD's Forced Retirement Policy, which was the focus of Mr. Pappas's EEOC Charge and the other plaintiffs' claims.  Indeed, Mr. Malik seems to imply that his unwilling retirement was due to a different MPD policy under which active duty MPD officers could not have defibrillators.  *See* Am.

Compl. ¶ 47 ("Mr. Malik was also informed that after [his] defibrillator was installed, he would no longer be eligible to work for MPD").[5]  Given that Mr. Malik does not allege discrimination under the MPD's Forced Retirement Policy, the Court does not see how Mr. Pappas's EEOC filing could have put the EEOC or MPD on notice regarding Mr. Malik's claims, or provided the MPD and EEOC with an opportunity for administrative consolidation and resolution as required. *See Brooks*, 606 F.3d at 804.  Consequently, this lack of similarly between Mr. Pappas's and Mr. Malik's claims bars the application of vicarious exhaustion as to Mr. Malik.

For these reasons, the Court will permit only Ms. Lindsay and Ms. Mathies to rely on the EEOC charge filed by Mr. Pappas, as it raised sufficiently similar claims to meet the notice function of the EEOC filing requirement.  The Court finds that Ms. Lindsay and Ms. Mathies have vicariously exhausted their administrative remedies under the ADA, while Mr. Malik has not.  As a result, Mr. Malik's ADA claim is dismissed.

**B.  Plaintiffs Ms. Lindsay, Ms. Mathies, and Mr. Malik's Section 504 Claims Are Barred by the Statute of Limitations**

Defendants argue next that Ms. Lindsay, Ms. Mathies, and Mr. Malik cannot bring claims under Section 504 as the relevant limitations period elapsed prior to the filing of the Amended

---

[5] Perhaps recognizing this pleading error, Plaintiffs attempt to provide additional facts in their opposition to address this omission.  They note that following Mr. Malik's heart surgery in September of 2017, he was involuntarily retired in June of 2018 "due to the Forced Retirement Policy."  Pls.' Opp'n at 7.  But as Defendants correctly point out, *see* Def.'s Reply at 4, a party cannot "amend his or her complaint by the briefs in opposition to a motion to dismiss."  *See Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n. 7 (D.D.C. 2014); *Perkins v. Vance-Cooks*, 886 F. Supp. 2d 22, 29 n. 5 (D.D.C. 2012) ("It is settled law in this circuit that a plaintiff may not raise new allegations in this manner."); *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n. 4 (D.D.C. 2010) ( "[P]laintiff failed to include these allegations in her complaint, and plaintiff may not amend her complaint by the briefs in opposition to a motion to dismiss.").  Therefore, the Court will not consider these new allegations.

Complaint. Defs.' Mem. Supp. at 13–16. Both parties are in agreement that without the benefit of tolling, the Section 504 claims brought by these Plaintiffs are time-barred. Pls.' Opp'n at 8; Defs.' Reply at 5. Defendants contend, however, that while Mr. Pappas's Section 504 claims were properly tolled, the other plaintiffs are not entitled to receive the benefit of this tolling. Defs.' Reply at 5. Unsurprisingly, Plaintiffs disagree, and posit that the running of the applicable tolling provision should be applied equally to all plaintiffs through the application of vicarious exhaustion. Pls.' Opp'n at 9. The Court finds that Defendants have the better of the argument, and Ms. Lindsay, Ms. Mathies, and Mr. Malik's Section 504 claims are time-barred.

   1. The D.C. Human Rights Act Provides the Proper Statute of Limitations Period

     Section 504 of the Rehabilitation Act does not contain its own statute of limitations period. *See Alexander v. Washington Metro. Area Transit Auth.*, 826 F.3d 544, 550–51 (D.C. Cir. 2016). As a result, "courts generally 'borrow one from an analogous cause of action.'" *Congress v. District of Columbia ("Congress II")*, 324 F. Supp. 3d 164, 171 (D.D.C. 2018) (quoting *Alexander*, 826 F.3d at 551). When faced with this determination, judges in this district have applied either the three-year statute of limitation for personal injury claims, or the one-year limitation period governing allegations of unlawful discrimination under the D.C. Human Rights Act. *See Congress II*, 324 F. Supp. at 171–72 (summarizing historical treatment of Rehabilitation Act statute of limitations cases in this district). In 2012, the D.C. Court of Appeals held that the D.C. Human Rights Act was the more analogous cause of action for Rehabilitation Act claims, and accordingly applied the one-year limitation period. *See Jaiyeola v. District of Columbia*, 40 A.3d 356, 368 (D.C. 2012). The *Jaiyeola* court justified their determination by noting that "[p]ersonal injury claims need not—and, indeed, typically do not—seek to remedy discrimination at all, and the three-year statute of limitations for such claims

certainly was not chosen with discrimination claims in mind." 40 A.3d at 367.  The D.C. Human

Rights Act, in contrast, "targets virtually all forms of disability discrimination, encompasses the

range of activities covered by the Rehabilitation Act, and has a statute of limitations intended

specifically for claims of discrimination." *Id.* at 367–68.  While the D.C. Court of Appeals

determination in *Jaiyeola* is not binding on this Court given that the Rehabilitation Act concerns

federal law, the decision still warrants "considerable persuasive weight" as an interpretation of

D.C. law, of which the D.C. Court of Appeals is the ultimate authority.  *See Congress II*, 324 F.

Supp. 3d at 173.  The Court finds this reasoning persuasive, as have the vast majority of courts

who have considered this issue post-2012.  *See e.g.*, *id.* at 172 ("Given the similarity of purpose,

rights, and remedies, the D.C. Human Rights Act is a better fit for the Rehabilitation Act.");

*Ware v. Hyatt Corp.*, No. 12-cv-0395, 2013 WL 12321372, at *15 (D.D.C. Mar. 27, 2013)

(noting the "Court finds the rationale of the D.C. Court of Appeals in *Jaiyeola* to be

persuasive."); *McFadden v. Washington Metro. Area Transit Auth.*, 204 F. Supp. 3d 134, 142

(D.D.C. 2016) (parties agree to apply one-year limitations period from D.C. Human Rights Act

to Rehabilitation Act claims); *Hatter v. Washington Metro. Area Transit Auth.*, 105 F. Supp. 3d

7, 10 (D.D.C. 2015) (same).  The Court will therefore analyze this issue under the one-year D.C.

Human Rights Act limitations period. [6]

---

[6] Before assuming, *arguendo*, that the one-year statute of limitation period applies,
Plaintiffs halfheartedly assert that the question of the appropriate limitation period "remains
unsettled in this Circuit."  Pls.' Opp'n at 8 n.2 (citing *Congress v. District of Columbia*
*("Congress I")*, 227 F. Supp. 82, 87 (D.D.C. 2017)).  But the case they rely on for this
proposition determined in a later decision that the one-year limitations period under the D.C.
Human Rights Act was the correct period to apply.  *See Congress II,* 324 F. Supp. 3d at 173.
And the only other case cited by Plaintiffs, *Minter v. District of Columbia,* applied the three-year
limitations period based on the parties' agreement to the previous pre-2012 standard, and cited
only pre-*Jaiyeola* precedent.  *See Minter v. District of Columbia ("Minter I")*, 62 F. Supp. 3d
149, 164 (D.D.C. 2014).  Consequently, the Court does not find Plaintiffs' argument compelling
on this issue.

2.  Mr. Pappas's Section 504 Claims were Properly Tolled

Plaintiffs maintain that their suit "was filed well before the one-year statute of limitations

for the Section 504 claims had run for any Plaintiff" because of the applicable tolling provisions

of the D.C. Human Rights Act.  Pls.' Opp'n at 9.  The D.C. Circuit has held that when a court

borrows a statute of limitations period from state law—such as the D.C. Human Rights Act at

issue here— it must also borrow the statute's tolling provisions.  *See Alexander*, 826 F.3d at 551

(explaining that "when a federal court borrows a limitations period from state law, that law's

tolling provisions come along as part of the package."); *see also Hatter*, 105 F. Supp. 3d at 10–

11 (concluding that "if the one-year statute of limitations under the DCHRA applies, so does the

Act's tolling provisions.") (internal quotation marks omitted).  The D.C. Human Rights Act states

that the "'timely filing of a complaint' with the EEOC or the D.C. Office of Human Rights 'shall

toll the running of the statute of limitations while the complaint is pending.'"  *Congress II*, 324

F. Supp. 3d at 173 (citing D.C. Code § 2-1403.16(a)).  Mr. Pappas filed a formal charge of

discrimination with the EEOC on October 5, 2015, almost exactly seven months after his

retirement from the MPD.  Am. Compl. ¶¶ 27, 57.[7]  As this action was taken within the one-year

limitations period, Mr. Pappas's claims were properly tolled on this date.

Once the EEOC or DOJ issues a right to sue letter, the statute of limitations begins to run

anew.  *Jaiyeola*, 40 A.3d at 369 ("The running of the statute of limitations resumes, in such a

situation, when the EEOC (or the Department of Justice, if the case was referred to it by the

EEOC for possible prosecution) issues a right-to-sue letter.").  On June 21, 2019, the DOJ issued

---

[7] Mr. Pappas's retirement date of March 6, 2015 is the latest date of injury giving rise to his Section 504 claims.  *See Long v. Howard Univ.*, 512 F. Supp. 2d 1, 14 (D.D.C. 2007), *aff'd*, 550 F.3d 21 (D.C. Cir. 2008) (noting claims under Section 504 accrue "when the plaintiff knew or had reason to know of the injury serving as the basis for his claim.").

Mr. Pappas a right to sue letter for his claims.  Am. Compl. ¶ 57.  Mr. Pappas then filed suit on September 19, 2019.  *Id.*  Mr. Pappas therefore timely filed his Section 504 claims, as his complaint was submitted before the tolled one-year statute of limitations period expired.  The outstanding question, however, is whether Ms. Lindsay, Ms. Mathies, and Mr. Malik, who both parties agree filed their claims outside of the one-year limitations period, can also claim the benefit of Mr. Pappas's tolling.

3.  Ms. Lindsay, Ms. Mathies, and Mr. Malik's Section 504 Claims Are Not Tolled

Plaintiffs contend that under the doctrine of vicarious exhaustion, "[b]ecause all Plaintiffs challenge the Forced Retirement Policy" the tolling Mr. Pappas received while his complaint was pending with the EEOC and DOJ also applies to the other Plaintiffs.  Pls.' Opp'n at 9.  But Plaintiffs offer no legal support for this assertion.  In response, Defendants argue first that the doctrine is inapplicable given that administrative exhaustion is not even required for non-federal employees under Section 504, and second, if the Court determined administrative exhaustion was required, they posit that it is a jurisdictional bar, meaning equitable remedies are not available. Defs.' Reply at 6.  The Court evaluates both of these arguments in turn, before engaging in an equitable tolling analysis.

Although the question has not been decisively resolved in this Circuit, it is generally understood that Section 504 claims brought by non-federal employees—such as the Plaintiffs here—are exempt from the administrative exhaustion requirements that govern claims brought by federal employees under the Rehabilitation Act.  *See e.g.*, *Adams v. District of Columbia*, 740 F. Supp. 2d 173, 182 (D.D.C. 2010), *aff'd in part*, 618 F. App'x 1 (D.C. Cir. 2015) (holding "the ADA's exhaustion requirement does not apply to the Rehabilitation Act and the plaintiff was not required to exhaust his administrative remedies for his Rehabilitation Act claims."); *Congress I*,

277 F. Supp. 3d at 87 ("because the Rehabilitation Act expressly incorporates Title VI and only one specific provision of Title VII, neither of which require exhaustion of administrative remedies, the Court finds more persuasive the interpretation that the Rehabilitation Act does not require exhaustion of administrative remedies."); *Minter I*, 62 F. Supp. 3d at 165 (noting that "[w]hile the D.C. Circuit has not addressed the issue since the 1992 amendments, every other Circuit to confront it has held likewise [that administrative exhaustion is not required]").  The Court concludes the Plaintiffs had no obligation to administratively exhaust their Section 504 claims.

Given that the Court has found no exhaustion requirement for claims brought by non-federal employees under Section 504, unsurprisingly the Court also concludes that there is no jurisdictional exhaustion requirement. *See* Defs.' Reply at 6.  Certainly, if Section 504 has jurisdictional exhaustion requirements, this Court would not have authority to create an equitable exception such as vicarious exhaustion. *See Doak v. Johnson*, 19 F. Supp. 259, 270 (D.D.C. 2014) (noting that Court "do[es] not entertain equitable defenses" such as vicarious exhaustion when "the relevant exhaustion inquiry is jurisdictional).  But given that exhaustion is not required, much less a jurisdictional requirement for non-federal employees under Section 504, the Court finds this argument to be without merit.

The D.C. Circuit has made clear that in order to find that an exhaustion requirement is jurisdictional, "a statute must contain 'sweeping and direct statutory language indicating that there is no federal jurisdiction prior to exhaustion, or the exhaustion requirement is treated as an element of the underlying claim.'" *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975)).  This in effect requires Congress to state "in clear, unequivocal terms that the judiciary is barred from hearing an action

until the administrative agency has come to a decision." *Id.* (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984)). But Section 504 contains no comparable "sweeping and direct" language of this nature, as neither it nor the provisions of Title VI it invokes mention exhaustion nor any jurisdictional limitations of the courts. *See* 29 U.S.C § 794(a)(2)); *see also Jones v. Dist. of Columbia*, 505 F. Supp. 2d 78, 85–86 (D.D.C. 2007) (noting "[the section of the] Rehabilitation Act [that] proscribes discrimination by executive agencies and federally funded entities and provides remedies set forth in Title VI, which does not explicitly require the exhaustion of administrative remedies").

The two cases Defendants cite do not hold otherwise. *Blackmon-Malloy v. U.S. Capitol Police Board*, 575 F.3d 699, focuses on the contours of jurisdictional exhaustion for an entirely different statute, the Congressional Accountability Act, and stands only for the widely accepted proposition that where exhaustion is a jurisdictional requirement vicarious exhaustion cannot be applied. *See Id.* at 705. And *Williams v. Brennan* concluded that exhaustion under the Rehabilitation Act is only jurisdictional with regards to federal government employees who pursue a remedy under Title VII, 42 U.S.C. § 2000e-16, which is available under the Rehabilitation Act "to any employee . . . aggrieved by the final disposition of [an administrative EEO] complaint or by the failure [of the agency] to take final action on such complaint." 320 F. Supp. 3d 122, 128 (D.D.C.) (citing 29 U.S.C. § 794a(a)(1)); *cf Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 34 (D.C. Cir. 2014) ("claims against a *federal agency*—such as [ ] Rehabilitation Act claims . . . —must initially be brought before the employing agency itself.") (emphasis added). Therefore Section 504's exhaustion requirement is not jurisdictional, and there is no barrier to the Court's jurisdiction or ability to provide equitable remedies.

Having cleared up the exhaustion requirements and jurisdictional status of Section 504 claims, the Court now turns to the substance of Plaintiffs' argument for equitable relief, which admittedly, is not altogether clear.  They claim that "[b]ecause all Plaintiffs challenge the Forced Retirement Policy, Plaintiff Pappas's EEOC complaint also applies to the other Plaintiffs' ADA and Section 504 claims pursuant to the vicarious exhaustion doctrine."  Pls.' Opp'n at 9.  But as previously discussed, there is no exhaustion requirement under Section 504 claims for non-federal employees, so there is no exhaustion requirement to vicariously excuse pursuant to the doctrine.  Plaintiffs' deficiency is a failure to meet a statutory deadline, not a failure to exhaust. Plaintiffs also provide no support for their claim, as they fail to identify *any* application of the vicarious exhaustion doctrine to toll a statutory deadline, much less one under which exhaustion is not even required.  (Indeed, they provide no citations to case law whatsoever in support of their argument).  However, granting Plaintiffs the benefit of all reasonable inferences, the Court interprets this argument as a request to equitably toll Ms. Lindsay, Ms. Mathies, and Mr. Malik's statutory deadline to file their claims, and will analyze it as such.

The equitable tolling analysis here is complicated by the fact that Section 504 contains no statute of limitations and borrows its limitation period from the D.C. Human Rights Act in this Circuit.  As previously mentioned, "[w]hen a federal cause of action borrows a state statute of limitations, 'coordinate tolling rules' are usually borrowed as well."  *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 764 (5th Cir. 2015) (quoting *Hardin v. Straub*, 490 U.S. 536, 539 (1989)); *see also Alexander*, 826 F.3d at 551 (same).  When considering this issue in the context of a Section 504 claim, the Ninth Circuit determined that "[a]long with the limitations period, the court borrows the state's equitable tolling rules, absent a reason not to do so." *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1135 (9th Cir. 2001); *see, e.g.*,

*Ahmed v. Regents of Univ. of California*, No. 17-cv-0709, 2018 WL 3969699, at *8 (S.D. Cal. Aug. 20, 2018) (applying California state equitable tolling rules to a claim under Section 504); *Chun v. City & Cty. of Honolulu*, No. 18-cv-00131, 2020 WL 3965943, at *3 (D. Haw. July 13, 2020) (applying Hawaii state equitable tolling rules to a claim under Section 504). The Court will therefore conduct the equitable tolling analysis under the law of the District of Columbia.

Generally, "District of Columbia law does not recognize an equitable tolling exception to the statute of limitations." *Doe v. Kipp DC Supporting Corp.*, 373 F. Supp. 3d 1, 15 (D.D.C. 2019) (citing *Nattah v. Bush*, 770 F. Supp. 2d 193, 208 (D.D.C. 2011)); *see also East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998) ("[R]ejection of the application of equitable tolling . . . rests on the belief that where the legislature has provided no savings statute, courts would exceed their prescribed role by providing a remedy.") (quoting *Sayyad v. Fawzi*, 674 A.2d 905, 906 (D.C. 1996)).[8] The D.C. Court of Appeals recognizes only "two limited exceptions to [its] generally strict application of statutes of limitations: the lulling doctrine and the discovery rule." *Graphic Arts*, 718 A.2d at 156. The lulling doctrine tolls the statute of limitations only when a defendant "has done anything that would tend to lull the plaintiff into inaction, and thereby permit the limitation prescribed by the statute to run." *Id.* at 156–57 (quoting *Bond v. Serano*, 566 A.2d 47, 50 (D.C. 1989)). Under the discovery rule, a claim "does not accrue until the plaintiff, exercising due diligence, has discovered or reasonably should have discovered all of the essential elements of her possible cause of action, i.e., duty, breach, causation and damages." *Kipp DC*, 373 F. Supp. 3d at 9 (quoting *Farris v. Compton*, 652 A.2d

---

[8] The D.C. Human Rights Act's limitations period that is borrowed here "contains no express provisions for tolling [its] one-year statute of limitations." *Graphic Arts*, 718 A.2d at 156 (citing D.C. Code § 1–2544).

49, 54 (D.C. 1994)).  There are no allegations in the Amended Complaint or Plaintiffs'

opposition that fit into either of these exceptions, rendering both doctrines inapplicable.[9]

Accordingly, because federal courts cannot deviate from the application of equitable tolling that

District of Columbia courts would undertake, *see Kipp DC*, 373 F. Supp. 3d at 15, Ms. Lindsay,

Ms. Mathies, and Mr. Malik are not entitled to equitable tolling of their Section 504 claims. [10]

In sum, Plaintiffs have failed to identify any reason that warrants equitable tolling by the

Court.  Their reliance on vicarious exhaustion, an equitable exception they have not shown to

have been applied to any statute that does not require exhaustion, much less the limitation statute

in question, appears misplaced as a result.  Accordingly, Ms. Lindsay, Ms. Mathies, and Mr.

Malik's Section 504 claims are dismissed as time-barred for the reasons detailed above.

---

[9] Equitable tolling arguments can be raised in either a complaint or a later opposition briefing.  *See McGary v. Crowley*, 266 F. Supp. 3d 254, 264 (D.D.C. 2017) ("[T]he Court must consider the basis for equitable tolling that [plaintiff] posits and supports in his opposition brief").  This is because untimeliness under the applicable statute of limitations is an affirmative defense, and "[a] plaintiff is not required to negate an affirmative defense in his complaint . . ." *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) (citation omitted); *see also de Csepel v. Republic of Hungary*, 714 F.3d 591, 607–08 (D.C. Cir. 2013) (same).

[10] Even if federal equitable tolling principals were to apply, Plaintiffs fare no better. The Court's equitable power to toll a statutory deadline is to be used "only in extraordinary and carefully circumscribed instances."  *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988); *see also Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990) ("Federal courts have typically extended equitable [tolling] only sparingly.").  "Extraordinary circumstances are circumstances that are beyond the control of the complainant which make it impossible to file a complaint within the statute of limitations." *Felter v. Norton*, 412 F. Supp. 2d 118, 126 (D.D.C. 2006) (citing *United States v. Cicero*, 214 F.3d 199, 203 (D.C. Cir. 2000)).  No such circumstances are present here.  Plaintiffs' sole argument boils down to that because Mr. Pappas met the statutory filing deadline, the other Plaintiffs should be excused because of the similarity of their claims, but they provide no explanation for why the other Plaintiffs sat on their rights until after the filing deadline passed.

### C.  Failure to Accommodate Claims Under the ADA and Section 504

Turning to the substantive claims in this matter, Defendants argue that the Plaintiffs'

claims alleging that they failed to accommodate their disabilities cannot survive.  Under both the

ADA and Section 504, a covered employer is required to "make reasonable accommodations to

the known physical or mental limitations of an otherwise qualified individual with a disability."

*Minter v. District of Columbia ("Minter II")*, 809 F. 3d 66,  69 (citing 42 U.S.C. §

12112(b)(5)(A) (ADA provision) and 29 U.S.C. § 794(d) (Rehabilitation Act provision

incorporating ADA standards)).[11]  Accordingly, to prevail on a claim for failure to

accommodate, the plaintiff must demonstrate that (1) they are a qualified individual with a

disability; (2) their employer had notice of their disability; and (3) their employer denied his

request for a reasonable accommodation.  *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014).

A disabled employee must also allege that they first requested reasonable accommodations from

their employer that were then refused in order to bring a failure to accommodate claim.

*Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  Defendants argue that the

following errors made by Plaintiffs warrant dismissal of these claims: (1) that from the face of

the complaint it does not appear that Plaintiffs requested accommodations from the MPD, (2)

that Plaintiffs fail to allege that they are "qualified individuals" with a disability for the purposes

of stating a failure to accommodate claim, and (3) that the accommodations requested were not

reasonable.  *See* Defs.' Mem. Supp. at 17–26.  These claims are examined in turn below.

---

[11] *See also* 29 U.S.C. §§ 705(34), 794(a) and (b)(1)(A) (application to the District of
Columbia).

1.  Plaintiffs Have Properly Alleged that They Requested Accommodations as Required Under

the ADA and Section 504

Both parties agree that the general rule is that, in order to state a claim under a failure to

accommodate theory, plaintiffs are required to have first made an affirmative request to an

employer for accommodations.  *See Flemmings,* 198 F.3d at 861 (noting an explicit

accommodation request is a "fundamental element" of a failure-to-accommodate claim);

*Woodruff v. LaHood*, 777 F. Supp. 2d 33, 40 (D.D.C. 2011) ("The burden . . . lies with the

disabled employee to request any needed accommodation."); *Evans v. Davis Mem'l Goodwill

Indus.,* 133 F. Supp. 2d 24, 28 (D.D.C. 2000) ("[w]hile plaintiff cites an obligation to engage in

an interactive process, with a disabled employee, this obligation is only triggered by an

affirmative request.").  This rule is based in the commonsense rationale that it would be unfair to

hold an employer liable for refusing to make an accommodation it was never asked to make.  An

employee's request for an accommodation does not need to be in writing or use the specific

phrase "reasonable accommodation," but the request must make sufficiently clear that the

employee "wants assistance with his or her disability so that he or she may return, or continue, to

work."  *Badwal v. Bd. of Trs. of Univ. of District of Columbia,* 139 F. Supp. 3d 295, 313 (D.D.C.

2015); *see also Evans*, 133 F. Supp. 2d at 28 (D.D.C. 2000) ("[w]hat matters under the ADA are

not formalisms about the manner of the request, but whether the employee or a representative of

the employee provides the employer with enough information that, under the circumstances, the

employer can be fairly said to know of both the disability and the desire for an

accommodation.").

Without this "fundamental element" a failure to accommodate claim typically cannot

succeed.  *See. e.g.*, *Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, 19 n.11 (D.D.C. 2016) (noting

where complaint is "devoid of any allegations that plaintiff requested and was denied an[]

accommodation" it fails to state a claim); *Badwal*, 139 F. Supp. 3d at 315 (same).  Plaintiffs do

not dispute that they failed to make an affirmative request for accommodations.  Pls.' Opp'n at 9.

However, they ask the Court to excuse this failure to "expressly request an accommodation" for

two primary reasons.[12]  *Id.*  First, they allege that in light of the Forced Retirement Policy, an

accommodation request would have been futile, second, they claim that Defendants were already

aware of their disabilities and desire for accommodations.  *See* Pls.' Opp'n at 9–15.  The Court

reviews each justification in turn.

### a. The Futility Doctrine is Not Applicable

Plaintiffs argue first that their failure to request reasonable accommodations should be

excused because this request would have been futile.  In doing so they invoke the futility

doctrine, under which "courts routinely excuse the need to request an accommodation where

such a request has no chance of success."  Pls.' Opp'n at 10.  Plaintiffs contend that the futility

doctrine is applicable here because they have alleged "that MPD maintained a 'policy or practice

of forcing employees with disabilities into retirement, with no possibility of reasonable

accommodation.'"  *Id.* at 11 (citing Am. Compl. ¶ 4).  However, Plaintiffs' own pleadings and

Mr. Pappas's EEOC charge undermine this claim, as they identify other employees who received

---

[12] Plaintiffs also claim offhand that the request requirement should be waived because
MPD did not have procedures in place to request a disability-based accommodation until 2017,
and because "MPD explicitly discouraged Mr. Malik from making an accommodation request."
Pls.' Opp'n at 10.  But Plaintiffs offer no further explanation for their claim Mr. Malik was
discouraged from making an accommodation request, and this assertion also finds no support
within the complaint.  And while Plaintiffs state that there were no procedures governing the
process for requesting a reasonable disability accommodation prior to the 2017 MPD Special
Order, *id.* at 15 n.6, the existence or lack thereof of formal policies in this respect does not
excuse Plaintiffs' burden to make a request.  Accordingly, neither argument has merit.

accommodations (presumably when requested).  Consequently, the futility doctrine is not available to remedy this pleading failure.

The Supreme Court has recognized that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to humiliation of explicit and certain rejection." *Teamsters v. United States*, 431 U.S. 324, 365–67 (1977).  The Court continued on to explain that "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.* at 365–66.  This futility doctrine was subsequently applied to employment actions through the legislative history of the ADA.  *See Davoll v. Webb*, 194 F.3d 1116, 1132–33 (10th Cir. 1999) (citing H. Rep. No. 101–485(II) at 82–83 (1990)).  However, this doctrine is only available "in the rare case where an employer has essentially foreclosed the interactive process through its policies or explicit actions . . ." *Id.* at 1333 (applying futility doctrine to excuse failure to request accommodations where plaintiff was aware of city's policy against reassignment and "was also explicitly told by [her Superior] that the city would not help her find another position.").

Here, Plaintiffs argue that the existence of the MPD's Forced Retirement policy allows the futility doctrine to be applied.  They contend that the policy was so absolute and "draconian" that they were relieved from their obligation to request accommodations because "such a request ha[d] no chance of success." Pls.' Opp'n at 10–11.  But contrary to their assertions that the MPD's Forced Retirement Policy "brooks no exceptions," *id.* at 12, Mr. Pappas's EEOC charge shows that in actuality, the policy did allow exceptions.  In his EEOC charge, Mr. Pappas described the discrimination he allegedly faced by being forced to take disability retirement after

he reached the "maximum allowable time, per MPD policy" at limited duty status.  *See* EEOC Charge at 3.  But he also contrasts his treatment with that of other MPD officers who "were allowed to stay working in limited-duty for much longer periods of time."  *Id*.  Mr. Malik's allegations in the Amended Complaint also undercut the assertion that the Forced Retirement Policy brooks no exceptions.  Mr. Malik details how he was "involuntarily retired . . . expressly on the basis of disability" after he received a heart defibrillator.  Am. Comp. ¶ 49; *see also id.* ¶ 27.  Mr. Malik also alleges that "[o]n information and belief, MPD did not involuntarily retire a different police officer who also had a defibrillator."  Am. Comp. ¶ 51.  Mr. Pappas's and Mr. Malik's own allegations thus directly refute Plaintiffs' assertion that the MPD's Forced Retirement policy "brooks no exceptions," and would have "no chance of success."  Pls.' Opp'n at 7.  Accordingly, the futility doctrine cannot be applied.

Even without the existence of these exceptions that show the Forced Retirement Policy was not so absolute to "essentially foreclose[]" Plaintiffs' opportunity for accommodations if requested, *see Davoll*, 194 F.3d at 1133, it is not clear that the MPD's policy would be enough to trigger the application of the futility doctrine.  Plaintiffs rely heavily on the determination in *Davoll* that a police department policy can serve as the basis for application of the futility doctrine.  *See* Pls.' Opp'n at 11.  But the underlying policy at issue in *Davoll* explicitly "forb[ade] disabled police officers from transferring into other vacant positions in the city government." *Id.* (citing *Davoll*, 194 F. 3d at 1125).  The Forced Retirement policy, even as alleged by Plaintiffs, does not contain any explicit ban on accommodations such as transfer to another department.  The *Davoll* court also premised their application of the doctrine on the fact that in addition to the city's explicit policy against reassignment, one of the plaintiffs in the case

was explicitly "told by [her Superior] that the city would not help her find another position."  *Id.*
at 1133.  No such additional factor exists in this case.

b.  *Plaintiffs Have Adequately Alleged that Defendants Knew of Their Disabilities and Desire for*
*Accommodation*

Plaintiffs also argue that their actions satisfy the request for accommodations requirement
"because Plaintiffs allege that Defendants knew of Plaintiffs' disabilities and need for
assistance."  Pls.' Opp'n at 12–13.  They posit a variety of theories that they argue demonstrate
that the MPD was made aware of Plaintiffs' desire for accommodations, citing communications
from Plaintiffs' doctors to the MPD, Mr. Pappas's application to another position, and the fact
that Plaintiffs had already received an accommodation by being placed on limited duty.  The
Court finds that while it is a close call, Plaintiffs have adequately pleaded that MPD was aware
of their desire for accommodations.

An affirmative request for accommodations is not required where an employer both (1)
"know[s] that the employee has a disability" and knows (2) "that the employee is seeking
assistance from the employer" in the form of accommodations.  *Thompson v. Rice*, 305 F. App'x
665, 668 (D.C. Cir. 2008); *Lee v. District of Columbia*, 920 F. Supp. 2d 127, 136 (D.D.C. 2013)
(excusing need for express request where the employer "knows of the disability and the
employee's desire for accommodations.").  The second step is crucial, because mere "[n]otice of
a disability does not ordinarily satisfy the ADA's request requirement."  *Waggel v. George*
*Washington Univ.*, 957 F.3d 1364, 1372 (D.C. Cir. 2020); *see also Windham v. Harris Cty.*, 875
F.3d 229, 238 (5th Cir. 2017) ("[K]nowledge of a disability is different from knowledge of the
resulting limitation. And it certainly is different from knowledge of the necessary
accommodation.").  Given that Plaintiffs had been placed on either limited duty or sick leave by

the MPD as a result of their medical issues, Am. Compl. ¶¶ 23, 31, 38, the MPD had notice and

was aware of Plaintiffs' disabilities.  The question thus becomes if Plaintiffs communicated to

the MPD that they sought additional accommodations.[13]  Defendants contend that this second

prong of the test cannot be met based on the pleadings in the complaint.  The Court concludes

that while it is a close call, Plaintiffs have adequately alleged that they requested

accommodations from MPD.

 Plaintiffs argue first that MPD was on notice of their request for accommodations due to

communications from their doctors to their supervisors at the MPD regarding their medical

issues.  Pls.' Opp'n at 13.  Several courts have determined that communications from medical

professionals to an employer can constitute a request for accommodations.  *See, e.g. Mobley v.*

*Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015) (proper request made where

"[Plaintiff] provided [employer] with Dr. Martin's opinion that [Plaintiff's] several impairments

necessitated a change in jobs); *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 610

(5th Cir. 2009) (proper accommodation request made in doctor's note to employer "[r]eleas[ing]

[plaintiff] to return to full-time employment at a sub-station closer to her home.") [14]  But unlike

the physician reports in these cases, the Amended Complaint does not allege that any of

---

[13] This determination is somewhat fraught for employers given the repercussions that can arise from assuming a need for accommodation where there is not one.  As the Senate Report accompanying the ADA states, without an affirmative request from the disabled employee, it is *inappropriate* on the part of the employer to provide an unsolicited accommodation.  *See* S. Rep. No. 101-116 (1989) at 34 (emphasis added).

[14] Plaintiffs also seek to bolster their argument that notes from Plaintiffs' medical providers should suffice as notice of an accommodation request by citing MPD General Order 100.14, which states in relevant part: "[a]ll doctors' notes shall be treated as a request for reasonable accommodation . . . ."  Pls.' Opp'n Ex. D, General Order:  Compliance with Title I of the Americans with Disabilities Act at 7, ECF No. 21-5.  But as Defendants correctly note, this order was issued on July 26, 2018, "long after each plaintiff was retired."  Defs.' Reply at 10 n.3. A policy that was not in effect at the time Plaintiffs' complaints originated cannot be used as the applicable standard to measure if a request for accommodation was made.

Plaintiffs' doctors made a specific request for accommodations or noted an accommodation in job duties or job role was medically necessary.  As alleged in the Amended Complaint, the doctor's notes in question simply summarized Plaintiffs' current condition.  *See e.g.*, Am. Compl. ¶ 27 (Mr. Pappas's October 17, 2014 doctor's report "stated he was hopeful Mr. Pappas would normalize within six months"); *id.* ¶ 33 (Ms. Lindsay's doctor's note stated "that she was expected to fully recover within six to twelve months after the surgery"); *id.* ¶ 41 ("Ms. Mathies's doctors anticipat[ed] that she would be able to perform the full scope of her duties six to twelve months after a third surgery").  Without more, the Court fails to see how this could qualify as an accommodation request.

Indeed, one of the cases relied on by Plaintiffs proves this exact point.  In *Ham v. Ayers*, the court found that a doctor's note that merely reported a medical update and did not note that the plaintiff required a medical accommodation could not be considered a timely request for accommodation.  *See Ham v. Ayers*, 229 F. Supp. 3d 32, 38–39 (D.D.C. 2017) (noting "report [that] only stated that [plaintiff] was 'qualified' to use a respirator" did not qualify as notice of a need for reasonable accommodations due to lung problems).  Here, the Plaintiffs have plead that only Mr. Pappas and Ms. Lindsay had notes from their medical professionals indicating the respective amount of time that was medically required before they could return to active duty, *see* Am. Compl. ¶¶ 27, 33, while the pleadings for Ms. Mathies indicate only that her doctors anticipated she would eventually be able to perform her duties after a third surgery, with no mention of an actual doctor's note.  *Id.* ¶ 41.  Mr. Malik's allegations are devoid of any mention of any sort of report or diagnostic prediction from his doctors.  A medical update on a plaintiffs' estimated recovery time is too far removed from a request for accommodations to be considered sufficient.  While the Court does not require any "magic words" be used to constitute a

reasonable accommodation request, even when construed liberally these physician reports are simply not enough to plausibly convey a desire by Plaintiffs to MPD for accommodations.

Further dooming this line of argument is that, as Defendants note in their reply, Plaintiffs fail to allege anywhere in their Amended Complaint that the physician assessments in question were actually sent to or received by MPD.  Defs.' Reply at 10.  Even given the benefit of every inference, Plaintiffs only state that despite the fact these reports existed, they were still involuntarily retired on the basis of their disability.  Recall that in the case of Ms. Mathies, Plaintiffs failed to even refer to a physician report, only that her doctors believed she would eventually be able to resume her duties at a later date, and Mr. Malik's allegations contain no reference to doctor's reports or evaluations at all.  Plaintiffs now attempt—impermissibly—to remedy this pleading error in their opposition, by claiming that they have alleged that "they provided information from their doctors to MPD regarding their disability."  Pls.' Opp'n at 13. As previously discussed, the Court may not consider any new allegations such as these raised for the first time in a plaintiff's opposition to a motion to dismiss.  *See Kingman Park*, 27 F. Supp. 3d at 160 n.7; *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d 18, 24 n. 8 (D.D.C. 2000) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss") (internal citations and quotations omitted).  Accordingly, because Plaintiffs have failed to allege that these physician assessments were received by MPD, they cannot serve as the basis for a valid accommodations request.[15]

---

[15] Plaintiffs assert in their opposition that they "notified MPD of their desire for reasonable accommodation through informal channels" due to the fact that "MPD did not develop procedures for requesting a reasonable accommodation based on disability until 2017." Pls.' Opp'n at 15 n. 6.  This does not change the fact that Plaintiffs have failed to plead in the amended complaint that Plaintiffs affirmatively notified MPD of their desire for reasonable accommodations through any channel, be it formal or informal.

Plaintiffs also argue they conveyed to the MPD their desire for accommodations when they "requested accommodations near the end of the 172-day period" of their sick leave or limited duty.  Pls.' Opp'n at 14.  As they correctly point out, "[a] request as straightforward as asking for continued employment is a sufficient request for accommodation."  *Mitchell v. Pompeo*, No. 1:15-cv-1849, 2019 WL 1440126, at *10 (D.D.C. Mar. 31, 2019).  However, with one exception, Plaintiffs provide no evidence to show that they made any request for continued employment.  They rely primarily on the already deemed unavailing physician assessments, which as previously discussed cannot constitute a request for accommodation.  They also claim that Mr. Pappas requested continuing employment by "applying to a civilian position within MPD" "[w]hile on limited duty."  Am. Compl. ¶ 25; Pls.' Opp'n at 14–15.  But the Amended Complaint contains no indication that MPD was notified or that Mr. Pappas communicated to any MPD employee, be it a colleague or supervisor, that he sought this new position in order to accommodate his disability or that he wanted further assistance from MPD in this regard.  And the act of applying to a new position with a different division of a large employer, without any further articulation of a desire for reassignment as an accommodation, falls short of the precedent in our district for what suffices as an accommodation request.  *See, e.g.*, *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1286–87 (D.C. Cir. 1998) (accommodation request made where plaintiff explicitly requested employer "to transfer him to a job that was compatible with his medical restrictions" prior to his application to vacant positions);  *Lee v. District of Columbia*, 920 F. Supp. 2d at 136 (D.D.C. 2013) (accommodation request made where plaintiff told a direct superior who was aware of his medical condition that he needed a break due to his disability);  *Mitchell*, 2019 WL 1440126 at *10 (request for reassignment made where plaintiff asked via email if she could "remain in the position that I am in for 4-6 months" and asked to "be an asset"

in either her current role or "in some other capacity.").  In contrast, the Amended Complaint does not describe any communication by Mr. Pappas—to his supervisor or to any other MPD employees –conveying either his desire for reassignment or that reassignment was his rationale for applying to the vacant MPD position.  This Court hesitates to create a rule that would hold an employer responsible for having to divine if a job application from a current employee in another division could constitute an accommodations request, particularly in a situation, such as here, where it is entirely unclear if the recipient of Mr. Pappas's application was familiar with his limited duty status or medical backstory.  Without more, Mr. Pappas's single job application to a civilian position within the MPD is not enough to constitute a request for accommodation and continued employment.

Plaintiffs' arguments are more convincing when they turn to the allegations made by Ms. Lindsay.  The Amended Complaint states that "MPD denied Ms. Lindsay's request for postponing the disability retirement consideration hearing" to a later date by which she was expected to have fully recovered from her injury.  Am. Compl. ¶ 33.  Giving Ms. Lindsay the benefit of all reasonable inferences in her favor, as we must at this stage, this statement could be construed as a request by Ms. Lindsay for continued employment.  By requesting a delay in her retirement hearing, Ms. Lindsay was in essence asking to remain a member of the MPD until she recovered from her foot injury.  She thus properly put the MPD on notice regarding her desire for accommodations due to her disability, and her failure to accommodate claims can proceed.

Plaintiffs' final argument, however, provides a basis to conclude that all Plaintiffs properly conveyed to MPD requests for accommodation.  Plaintiffs posit that their placement on light duty and or sick leave was itself an accommodation from the MPD.  Pls.' Opp'n at 14.  So because this accommodation was already in effect and accepted by Plaintiffs, Plaintiffs were not

required to request further accommodations, because an employer's obligation to participate in the interactive accommodation process is a continuing one. *Id.* After giving Plaintiffs the benefit of all reasonable inferences, the Court agrees.

First, the Court concludes that MPD granted each of the Plaintiffs an initial accommodation by placing them on either sick leave or on light duty, as these changes to Plaintiffs' job responsibilities fit the definition of a reasonable accommodation under the ADA.[16] And as previously discussed, MPD had to know of Plaintiffs' disabilities in order to grant these initial accommodations, and the Court believes that Plaintiffs made their desire for accommodations clear by accepting the offered job role modifications. By doing so, Plaintiffs conveyed that they were "seeking assistance from [MPD]" in the form of accommodations. *Thompson*, 305 F. App'x at 668. Given that at this point MPD was both aware of Plaintiffs' disabilities and their desire for at least these initial accommodations, these actions sufficiently constitute a request for accommodation.

Once an employee requests an accommodation, the interactive process of the ADA and Rehabilitation Act begins. *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005). The interactive process "a flexible give-and-take between employer and employee so that together they can determine what accommodation would enable the employee to continue working." *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014). Most crucially here, an employer's "duty to accommodate is a continuing duty that is not exhausted by one effort." *Norden v. Samper*,

---

[16] The ADA defines an accommodation as "any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities." 29 C.F.R. § 1630.2(o) (1997). The EEOC Guidance lists both job restructuring and part-time or modified work schedules as examples of possible reasonable accommodations an employer might be required to provide under the ADA. *See* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act* (2002), 2002 WL 31994335, at *24.

503 F. Supp. 2d 130, 145 (D.D.C. 2007) (citing *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d

1128, 1138 (9th Cir. 2001)) (noting the obligation continues "where the employer is aware that

the initial accommodation is failing and further accommodation is needed."); *Ralph v. Lucent

Techs., Inc.*, 135 F.3d 166, 172 (1st Cir. 1998) (same).

The question before the Court is thus if it is reasonable to conclude MPD was aware the

initial accommodations to Plaintiffs were failing and further accommodations were needed.  The

Court concludes that this is a reasonable inference to make.  The Plaintiffs were all placed on

limited duty or sick leave due to their disabilities that left them unable to fulfill the duties of an

MPD active duty officer without accommodations.  Yet MPD sought to terminate this initial

accommodation after 172 days pursuant to the Forced Retirement Policy, precisely *because* they

could no longer fulfill the duties of an active duty MPD officer.  *See* Defs.' Mem. Supp. at 4

(citing D.C. Code 5-633(c)) (detailing how the policy mandates that when an officer accrues 172

days at less than full duty status from injury or illness, the Director of Medical Services must

process them for retirement).  MPD knew Plaintiffs could not resume their prior active duty

officer role due to their disabilities, so by terminating the initial accommodation they knew

Plaintiffs would be forced out of the MPD.[17]  Based on this, the Court can infer that MPD was

reasonably aware that further accommodations would be needed for Plaintiffs to continue their

employment with the MPD (particularly because the initial accommodations only failed because

MPD withdrew them).  Plaintiffs are not required to make a new and additional request for

---

[17] At least one court in our district has discussed that under the interactive process, employers have an obligation to communicate in good faith with employees prior to withdrawing a pre-existing accommodation.  *See Robinson v. Washington Metro. Area Transit Auth.,* No. 18-cv-2383, 2020 WL 601896, at *4 (D.D.C. Feb. 7, 2020) (noting "withdrawing a pre-existing accommodation may indeed give rise to liability" where the accommodation is withdrawn without evidence of further negotiations between the parties).

accommodations given that the interactive process was already ongoing and MPD was reasonably aware that the initial accommodation was failing because they chose to terminate it. Plaintiffs' responsibility to request accommodations is accordingly excused on this ground.

2.   Plaintiffs Adequately Allege They Were Qualified Individuals

Defendants also argue that Plaintiffs have not alleged the required elements necessary to show that they were "qualified individuals" under the ADA or Section 504.  Defs.' Mem. Supp. at 19–22.  A "qualified individual" is someone who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." *Minter II*, 809 F.3d at 69–70.  Defendants claim that Plaintiffs have failed to make the necessary pleadings that, even with a reasonable accommodation, they could have performed the job of an MPD officer.  Defs.' Reply at 12.  Plaintiffs respond that they need only have alleged they could perform the essential functions of either their original position or of other vacant government positions with reasonable accommodations.  Pls.' Opp'n at 18.  The Court finds that Plaintiffs have adequately alleged in the Amended Complaint that they were qualified individuals.

To succeed on a failure to accommodate claim, a plaintiff must show that he or she is a "qualified individual" under the ADA and Rehabilitation Act.  *Minter II*, 809 F.3d at 69.  A qualified individual is one whom, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The inclusion of the phrase "or desires" within the statutory definition broadens the term to encompass "employee[s] seeking reassignment to a vacant position . . . if, with or without reasonable accommodation, [they] can perform the essential functions of the employment position to which [they] seek[] reassignment."  *Aka*, 156 F.3d at 1301; *Daugherty v. City of El Paso*, 56 F.3d 695, 698–99 (5th Cir. 1995) (same).  The determination examines

"plaintiff's capacity to perform the essential functions of her job . . . at the time of the denial of accommodations." *Mack v. Georgetown Univ.*, No. 15-cv-793, 2017 WL 4325596, at *13 (D.D.C. Aug. 4, 2017), *aff'd*, No. 17-cv-7139, 2018 WL 3156846 (D.C. Cir. May 24, 2018).  A determination that a plaintiff is not a "qualified individual" is rare on a motion dismiss, given that a finding of this nature requires unspooling if the plaintiff can perform the "essential functions" of a position, and determining a job's "essential functions" is typically a "factual issue to be determined by a jury." *Kirkland v. McAllenan*, No. 13-cv-194, 2019 WL 7067046, at *8 (D.D.C. Dec. 23, 2019); *Baker v. Potter*, 294 F. Supp. 2d 33, 44 (D.D.C. 2003) (collecting cases).  However, such a finding can be appropriate at the motion to dismiss stage where a plaintiff has "not indicated that he could perform the essential elements of his job . . .  and has not identified any reasonable accommodation that would allow him to do so." *See Saunders v. Galliher & Huguely Assocs., Inc.*, 741 F. Supp. 2d 245, 249 (D.D.C. 2010).

Plaintiffs have properly alleged that they are qualified individuals under the ADA and Section 504 because the Amended Complaint contains pleadings that they could perform the essential elements of either their current position with reasonable accommodations, or that of a job obtained through reassignment to a vacant position.  Admittedly, the Plaintiffs' pleadings concerning this topic in the Amended Complaint are sparse.  The only mention of Plaintiffs' ability to perform the essential functions of any position comes from their claims for relief, where they assert that "[p]laintiffs and the members of the Accommodations Class are or were able, with or without reasonable accommodation, to perform the essential functions of their positions with job restructuring or extended leave, or could have performed the essential functions of a position obtained through reassignment." Am. Compl. ¶¶ 81, 95.  But this is enough.

Defendants argue that Plaintiffs have failed to meet their pleading burden because they have "fail[ed] to allege that [Plaintiffs] were at any point able to resume . . . performing the essential duties of a police officer." Defs.' Mem. Supp. at 20.  But Defendants misunderstand Plaintiffs' pleading burden. "[T]he essential duties of [an employee's] position are a question of fact" which are not required to be "alleged with particularity." *Floyd v. Lee*, 968 F. Supp. 2d 308, 327 (D.D.C. 2013).  And nothing in the Amended Complaint states that Plaintiffs were unable to perform certain duties that were essential to their role as MPD officers.  *See Saunders*, 741 F. Supp. 2d at 249 (finding that where essential elements of the job of truck driver, as plead in complaint, contained tasks plaintiff plead he was unable to perform, plaintiff was not "qualified" for position).  Defendants contend that "in light of the statutory fitness requirements for MPD officers, *see* D.C. Code 5-107a(a), plaintiffs have not plausibly plead they could perform the essential functions of a police officer position with the kinds of limitations they allege." Defs.' Reply at 12 n.4.  The Court finds that such a determination would require wading into the fact-intensive inquiry of what constitutes the essential functions of an MPD officer (and of Plaintiffs' physical capabilities), a task it need not undertake at this stage of litigation.  While the Plaintiffs may ultimately be unsuccessful at proving that they could perform the essential functions of the MPD officer position given their various disabilities, they have adequately alleged for the purposes of this motion to dismiss that they "could perform the essential functions of their positions" by stating they could do so "with job restructuring or extended leave . . ." Am. Compl. ¶ 81.

Plaintiffs have also adequately plead that they could perform the essential functions "of other vacant government positions with reasonable accommodations." Pls.' Opp'n at 16, 18. Under the governing legal standard, a plaintiff can demonstrate that he or she is a qualified

individual if it is alleged that, "with or without reasonable accommodation, [they] can perform the essential functions of the employment position to which [they] seek[] reassignment." *Aka*, 156 F. 3d at 1301.  The Amended Complaint contains an assertion for each plaintiff, that, "[o]n information and belief, Defendants had vacant positions available for which [Plaintiff] was qualified during the relevant period."  Am. Comp. ¶ 29 (Mr. Pappas), ¶ 36 (Ms. Lindsay), ¶ 44 (Ms. Mathies), ¶ 53 (Mr. Malik).  Again, these allegations are admittedly light on details.  There is no description of what these vacant positions may be, and no assertion that each Plaintiff could perform the "essential functions" of these unnamed vacant positions, simply that they "were qualified." *Id.*  However, giving Plaintiffs the benefit of every reasonable inference, they have met their pleading burden that they could fulfill the essential functions of vacant positions within the MPD, particularly in light of MPD's obligation to assist with job reassignment for plaintiffs as part of the interactive accommodation process.

Defendants argue that Plaintiffs cannot claim to be qualified individuals for MPD's vacant positions because they were not actively "seeking reassignment" to these positions. Defs.' Reply at 12 (citing *Aka*, 156 F.3d at 1301 ("*An employee seeking reassignment* to a vacant position is thus within the definition [of 'qualified individual'] if, with or without reasonable accommodation, she can perform the essential functions of the employment position *to which she seeks reassignment*.") (emphasis added)).  But as previously described, under the "interactive process" that follows an employee's request for a reasonable accommodation, "[i]f a reasonable accommodation turns out to be ineffective . . . [and i]f there is no alternative accommodation, then the employer must attempt to reassign the employee to a vacant position for which s/he is qualified, unless to do so would cause an undue hardship."  U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the*

*Americans With Disabilities Act* (2002) 2002 WL 31994335, at \*24 (hereinafter "Enforcement

Guidance"); *Harris v. Chao*, 257 F. Supp. 3d 67, 76 (D.D.C. 2017) ("when an accommodation

cannot be made in the employee's current position," an employer "must consider the feasibility

of reassigning the disabled employee to a vacant position").  This is such a case where Plaintiffs

have plausibly alleged that reassignment was required.  As previously discussed, the Court has

determined that Plaintiffs requested accommodations from MPD by accepting an initial

accommodation of sick leave or light duty assignment, triggering the interactive process.  *See*

*supra* Section IV.2.a.  But due to their disabilities Plaintiffs could not perform as active duty

officers without accommodations, and under the Forced Retirement Policy, they could not

remain on sick leave or limited duty status.  The only remaining accommodation left is job

transfer, which MPD was obligated to assist Plaintiffs in obtaining, as employers have an

"obligation to help [employees] identify appropriate job vacancies (since plaintiffs can hardly be

expected to hire detectives to look for vacancies)."  *Aka,* 156 F.3d at 1304 n.27.  This is a

sufficient basis to conclude that Plaintiffs were "seeking reassignment" and can plead (as they

did) that they were qualified individuals for MPD's vacant positions.  Accordingly, the Plaintiffs

have adequately plead that they "were qualified" for the vacant positions Defendants had

available.

## D.  A Determination of Whether Plaintiffs' Requested Accommodations Were Reasonable Is Inappropriate At this Stage of Litigation

Defendants also contend that Plaintiffs fail to state a claim because the two

accommodations they allege they should have received—further extensions of leave and/or

reassignment—are not reasonable.  *See* Defs.' Mem. Supp. at 22–26.  However, the

reasonableness of an accommodation request is typically an inappropriate inquiry at the motion

to dismiss stage.  *See Buie v. Berrien*, 85 F. Supp. 3d 161, 172–73 (D.D.C. 2015) (noting that the "reasonableness of plaintiff's [accommodation] requests . . . are questions of fact that are inappropriate for resolution on a motion to dismiss."); *Hodges v. District of Columbia*., 959 F. Supp. 2d 148, 155 (D.D.C. 2013) (determining that "the reasonableness of the accommodation offered by the District" is "an issue that is not appropriately decided on a motion to dismiss"); *Di Lella v. Univ. of Dist. of Columbia David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 8 (D.D.C. 2008) (concluding that, because whether an "accommodation is effective or reasonable depends on the facts and circumstances of each case," such a determination cannot be made on a motion to dismiss); *see also Kennedy v. Dresser Rand Co*., 193 F.3d 120, 122 (2d Cir. 1999) (noting that "the question of whether a proposed accommodation is reasonable is 'fact-specific' and must be evaluated on 'a case-by-case basis.'").  This is further borne out by the fact that all of the cases cited by Defendants concerning a determination that the requested accommodations were not reasonable, with one exception,[18] were determined after discovery at the summary judgment phase of litigation.  The Court accordingly declines to engage in the fact-intensive reasonableness inquiry here without the benefit of a full evidentiary record.

---

[18] The single case cited by Defendants in which a court made a reasonability determination on a motion to dismiss is inapposite to the instant case.  In *Hwang v. Kansas State Univ.*, the plaintiff in question had conceded that she could not "work at any point or in any manner," for over six months, when she requested additional leave as a "reasonable accommodation."  *Hwang v. Kansas State Univ.*, 753 F.3d 1159, 1161 (10th Cir. 2014).  The Tenth Circuit concluded that because the plaintiff could not work at all, there was no "reasonable accommodation" that would allow her to perform the essential functions of her job.  *Id.* at 1162.  But unlike in *Hwang,* the pleadings do not establish that any of the plaintiffs were in a similar situation where they could not work at all, and they have alleged that they could perform the essential functions of their original position, or that of a position obtained through reassignment, with reasonable accommodations.  Am. Compl. ¶¶ 81, 95.  Accordingly, *Hwang* does not govern here.

In response, Defendants argue that these claims still warrant dismissal because they are so conclusory that they fail to meet the required pleading standard. Defs.' Reply at 14–15. The Court disagrees. Plaintiffs allege in their Amended Complaint that they were denied "the possibility of reasonable accommodation by reassignment, job restructuring, or extended leave." Am. Compl. ¶ 4; *see also id.* ¶¶ 35, 52, 81, 95. Job restructuring is, as Defendants admit, Defs.' Mem. Supp. at 25, a possible reasonable accommodation under the ADA and Section 504. *See Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007) ("'Reasonable accommodation'" may include 'job restructuring' and 'part-time or modified work schedules.'") (citing 42 U.S.C. § 12111(9)(B)). And so is job reassignment—indeed, MPD, as plaintiffs' employer, was likely required to investigate reassignment as a possible reasonable accommodation. *See Enforcement Guidance* at *24 (noting that if an initial accommodation fails, "then the employer must attempt to reassign the employee to a vacant position for which s/he is qualified, unless to do so would cause an undue hardship."). Consequently, the reasonable accommodations invoked by Plaintiffs, while not brimming with details, do state a facially plausible claim. Plaintiffs have accordingly plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Accordingly, Mr. Pappas's failure to accommodate claims under the ADA and Section 504, and Ms. Lindsay and Ms. Mathies's failure to accommodate claims under the ADA survive.

### E.  Mr. Pappas Has Not Sufficiently Alleged Unlawful Medical Inquiries Claims

Next, the Court turns to Mr. Pappas's unlawful medical inquiry claims under the ADA and Section 504, which he brings on behalf of a putative class of more than 1,000 current and former MPD officers. *See* Am. Compl. ¶¶ 61, 64. Mr. Pappas alleges that the MPD made unlawful medical inquiries by requiring him to provide the medical records of his treatment for

congestive heart failure and by the MPD "communicat[ing] directly with his treating physicians." Pls.' Opp'n at 22–23 (citing Am. Compl. ¶ 24). Defendants respond by arguing that Mr. Pappas fails to sufficiently state a claim within the meaning of the two statutes, given that both exempt an employer's medical inquiries into the ability of an employee to perform job-related functions. *See* Defs.' Mem. Supp. 26–29. The Court agrees with Defendants, and accordingly grants the motion to dismiss Mr. Pappas's unlawful medical inquiry claims.

The ADA dictates that a covered employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability." 42 U.S.C. § 12112(d)(4)(A).[19] There is, however, an exception that allows for an employer to "make inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B); *see Doe v. U.S. Postal Serv.*, 317 F.3d 339, 345 (D.C. Cir. 2003) (explaining that medical inquiries where an employer was "trying to determine whether [the employee] was unable to perform the functions of [their] position" are permissible). As a result, the burden rests on Mr. Pappas to plead that the inquiries at the center of his improper medical inquiry claims are *not* job-related. *See Blackwell v. SecTek, Inc.*, 61 F. Supp. 3d 149, 159 (D.D.C. 2014) (dismissing claims where plaintiff "failed to plead that [certain medical inquiries] were not 'job-related'").

Mr. Pappas argues that the medical inquiries in question covered non-job-related medical records that went beyond what was "job-related and consistent with business necessity." Pls.' Opp'n at 22 (citing Am. Compl. ¶¶ 102–03). Mr. Pappas also posits that MPD's inquiries were "unnecessarily intrusive" because they "contacted his doctors directly and demanded his medical

---

[19] The same standard under the ADA governs improper medical inquiries brought under the Rehabilitation Act in this Circuit. *See Porfiri v. Eraso*, 121 F. Supp. 3d 188, 197 (D.D.C. 2015); *Cripe v. Mineta*, No. 03-cv-2206, 2006 WL 1805728, at *5 (D.D.C. June 29, 2006).

test results" rather than allowing Mr. Pappas to act as the go-between to ensure that "only appropriate, job-related information was conveyed from his doctors to his employer."  Pls.' Opp'n at 23.  The Court disagrees with Mr. Pappas's characterization of the MPD's inquiries as alleged in the pleadings.

First, the Amended Complaint contains no allegations that the MPD's medical inquiries as to Mr. Pappas were not job-related.  In his opposition, Mr. Pappas artfully selects various quotations out of context to argue that he met this pleading burden. But viewed as written in the Amended Complaint, none of his allegations offer more than "conclusory statements" and "threadbare recitals of the elements of a cause of action," of the type that are insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678; *see, e.g.*, Am. Compl. ¶ 102 ("Improper employer questions, examinations, and medical requests themselves constitute illegal discrimination unless they are job-related . . . "); *id.* ¶ 61 (defining proposed class as all employers subjected to "Defendants' policy of requiring . . . submission of medical records to MPD . . . for which the inquiry or information was not limited to that which was necessary to aid in approval of requested sick leave or reasonable accommodations").  And indeed, the inquiries Mr. Pappas describes in the Amended Complaint are, on their face, directed at determining if he could "perform [the] job-related functions" of his role as an MPD police officer, following his illness that necessitated his placement on limited-duty status.  The Amended Complaint states that Mr. Pappas was required to provide "detailed medical records *of his diagnosis and treatment*" and was required periodically to "provide the medical records *of his treatment*."  Am. Compl. ¶¶ 22, 24 (emphasis added).  The repeated qualification "of his treatment" suggests that the medical records requested by MPD were only in relation to the congestive heart failure injury for which Mr. Pappas was placed on limited duty.  As discussed, it is permissible for employers

to inquire about an employee's health conditions to determine whether the employee can perform job-related functions, particularly when the injury relates to "an essential precondition for [the employee's] ability to perform any work at all." *Brown v. Hayden*, No. 18-cv-2561, 2020 WL 6392746, at *13 n.8 (D.D.C. Nov. 2, 2020). This rationale is all the more imperative given that Mr. Pappas and the purported class in question are police officers, and must be physically capable of carrying out their job responsibilities in order to ensure public safety. *See e.g.*, *Taylor v. City of Shreveport*, 798 F. 3d 276, 286 (5th Cir. 2015) ("[A] police department must ensure that its officers are in peak physical and mental condition" so they can carry out their charge to "maintain[] public safety.").

Second, Mr. Pappas fails to allege why MPD's inquiries were unnecessarily intrusive. His allegation that MPD "communicated directly with his treating physicians" does not change the nature of the requests into his ability to perform the requisite job functions of a police officer. Am. Compl. ¶ 24; *see Austin v. Wash. Metro. Area Transit Auth.*, No. 19-cv-2718, 2020 WL 2962609, at *8–*10 (D.D.C. May 28, 2020) (holding that inquiries for medical records and inquiries made directly to employee's doctor regarding employee's kidney condition were job-related and necessary to determine whether train operator could operate a train safely). Indeed, the EEOC has recognized in its own guidance that an employer can make "disability-related inquiries or require a medical examination" in "limited circumstances" such as "when an employee who has been on leave for a medical condition seeks to return to work." *Enforcement Guidance* at 13. In sum, the allegations set forth in the Amended Complaint do not plausibly allege that the medical inquiries were "unlawful" under the ADA or Rehabilitation Act. Therefore, the Defendants' motion to dismiss Mr. Pappas's unlawful medical inquiry claims in Counts Three and Count Four of the Amended Complaint is granted.

**F.  Although MPD is Not an Appropriate Defendant, Chief Newsham (or his Successor) Is**

In their final argument, Defendants move to dismiss both MPD and Chief Newsham as defendants, asserting that MPD is "*non-sui juris*," meaning they cannot be sued, and because the claims against Chief Newsham in his official capacity are duplicative of the claims against Defendants, meaning they too must be dismissed.  Defs.' Mem. Supp. at 30.  Plaintiffs respond by claiming that Chief Newsham is a proper defendant because they seek injunctive relief and Chief Newsham is "the primary person to ensure" the implementation of policies at MPD that will provide such injunctive relief.  Pls.' Opp'n at 24.  They do not, however, contest dismissal of MPD, "[b]ecause MPD is a sub-agency of the D.C. government.  Pls.' Opp'n at 3.  The Court finds that Chief Newsham (or his successor) is a proper defendant in this suit, and agrees with both parties that MPD is not an appropriate defendant.

MPD must be dismissed as a defendant because as a District of Columbia agency, the MPD is *non sui juris* and cannot sue or be sued as a separate entity.  *Nutt v. Dist. of Columbia Gov't.*, No. 19-cv-3220, 2020 WL 4597100 at *1 n. 4 (D.D.C. Aug. 11, 2020) (citing *Heenan v. Leo*, 525 F. Supp. 2d 110, 112 (D.D.C. 2007)); *see also Fre v. Monk*, No. 15-2192, 2017 WL 627371 at *2 (D.D.C. Feb. 15, 2017) (granting dismissal of MPD as party defendant).  Plaintiffs do not contest dismissal.  Pls.' Opp'n at 3.  Therefore, the Court grants the District's motion to dismiss the MPD as a defendant.

Chief Newsham (or his successor), however, is a proper defendant in this action and may be sued for injunctive relief in his official capacity.  Defendants are correct that "a suit for damages against municipal officials in their official capacities is the equivalent to a suit against the municipality itself."  Defs.' Mem. Supp. at 30 (quoting *Cotton v. District of Columbia*, 421 F. Supp. 2d 83, 86 (D.D.C. 2006)).  In this case, however, Chief Newsham is being sued in his

official capacity for injunctive relief, not monetary damages, which is non-duplicative and thus permitted.  *See Simpson v. Fed. Bureau of Prisons*, No. 19-cv-3173, 2020 WL 95814 at *3 (D.D.C. Jan. 8, 2020); *see also Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 26 (D.D.C. 2007) ("[C]ourts have long recognized that federal officers may be sued in their official capacity for prospective injunctive relief to prevent ongoing or future infringement of federal rights.") (citing *Rhode Island Dept. of Envtl. Mgmt. v. United States*, 304 F. 3d 31, 41 (1st Cir. 2002)).  Because Plaintiffs seek a "permanent injunction enjoining Defendants . . . from engaging in employment practices that discriminate on the basis of disability . . ."  and seek the "implementation of policies to restructure positions when needed to accommodate employees with disabilities," rather than monetary damages from Chief Newsham, he (or his successor) is a proper defendant in his official capacity.  Am. Compl. ¶ 19. Defendants' motion to dismiss Chief Newsham as a defendant is therefore denied.

### G.  Leave to Amend

In their opposition brief, Plaintiffs request "leave to amend their complaint" "should this Court require more" in the way of specificity of the pleadings.  Pls.' Opp'n at 10.  For the reasons detailed below, the Court will grant Plaintiffs' request to amend to address the various pleading deficiencies identified in this opinion.

Under the Federal Rules of Civil Procedure, once a defendant has responded to a complaint and more than 21 days have elapsed, the plaintiff may amend his or her complaint "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  The grant or denial of leave to amend lies in the sound discretion of the district court.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  However, it is to be "freely given when justice so requires."  *Id.*  For where "the underlying facts or circumstances relied upon by a

plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 181– 82(1962) (cautioning that the pleading phase should not be turned into a "game of skill in which one misstep by counsel may be decisive to the outcome") (quotation omitted).  Accordingly, leave to amend should be denied only if the court determines there to be a sufficient reason such as futility of amendment, undue delay, bad faith, dilatory motive, undue prejudice or repeated failure to cure deficiencies by previous amendments.  *Id*.; *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1083 (D.C. Cir. 1998).

It is in the interest of justice to grant Plaintiffs' request to amend here.  Plaintiffs seek leave to correct various pleading errors, among them some that they impermissibly attempted to supplement through their opposition brief.  Given that this case is still in its beginning stages, and allowing amendment will not prejudice Defendants, there is no sufficient reason to deny this request.  *See, e.g.*, *Norris v. Salazar*, 746 F. Supp. 2d 1, 4 (D.D.C. 2010) (granting leave to amend the complaint where, "because of the early stage of the litigation, any delay would be minimal" and "[D]efendant would not be unduly prejudiced"); *Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006) (finding no prejudice to defendants where amendment would not "unduly increase discovery or delay the trial, and when the opponent could not claim surprise") (citation omitted).  Accordingly, Plaintiffs' request for leave to amend is granted.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 19) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs are granted **LEAVE TO AMEND within 30**

**days**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 12, 2021                                    RUDOLPH CONTRERAS
                                                                        United States District Judge