# EXHIBIT F

UNITED STATES DISTRICT COURT OF
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - :
:
STEVE PAPPAS, et al., :
:
Plaintiffs, : CASE NO.
:
vs. : 19-cv-02800 RC
:
METROPOLITAN POLICE :
DEPARTMENT OF THE DISTRICT OF :
COLUMBIA, et al., :
:
Defendants. :
:
- - - - - - - - - - - - - - - - :

DEPOSITION OF MATT MIRANDA

DATE: February 16, 2022
TIME: 10:00 a.m.
LOCATION: Via Zoom Videoconference

REPORTED BY: Constance H. Rhodes
Reporter, Notary

Veritext Legal Solutions
1250 Eye Street, Northwest
Washington, DC 20005

A It depends on the nature of the issue that we have to deal with. Obviously, I have a relationship with Director Angela Simpson; and then Captain Dan Harrington, who is the administrative captain, is a point of contact that I regularly reach out to as well.

Q Okay.

A Not exclusive to us, but those are the principals.

Q Okay. And what is MSD's relationship with the PFC clinic?

A Well, again, as the director of MSD, my -- I serve as the contract administrator for the PFC contract.

And so as the contract administrator, I work with the OCP contracting officer to deal with all issues related to contractual obligations and managing those contractual obligations, certifying vouchers for payment for services, and just the regular day-to-day interactions.

Q When you say --

A I'm sorry. And just, again, to kind of

highlight that point, our offices are actually co-located in the PFC building.

Q And when you say contractual obligations, what are your contractual obligations?

A Oh, gosh, there's a 75-page contract between the district and -- and -- and -- and the PFC.

But, I mean, to boil it down in its most simplest forms, you know, the contract requires that the, you know, the PFC to treat and pay for any injuries that are deemed to be born in the performance of duty, both for police and firefighters. That is obviously, first and foremost, the most fundamental aspect of the contract.

And then there is a series of other administrative aspects of the contract. They perform biennial physicals; they -- they monitor non-POD injuries, they deal with all of our applicants, they process and screen all of our applicants medically, and a series of other issues.

Q And the PFC clinic is responsible for evaluating officers who develop an illness or injury or disability and go through the disability retirement process, right?
MR. SOBIECKI: Object to form.
THE WITNESS: Just to -- just to clarify, yes, they -- they do make duty-status decisions; they do either treat or monitor injuries or illnesses. That is correct.
And they do play a role in the retirement board process. That is correct.
BY MS. LANGLEY:
Q So on any given day, how do you, as medical services director, typically engage with employees at the PFC?
A As necessary. You know, again, we work on scheduling issues for members with performance of duty injuries. Many have to be referred out to specialists for appointments or physical therapy for treatments or a variety of different treatment-related issues.
We work regularly with the PFC and their

case managers on scheduling and coordinating with our members to ensure they are notified to, you know, to attend those specific appointments.

Again, we work on applicants. We work on a variety of different, you know, issues that may arise during the day. You know there are some days where we don't talk directly to any of the PFC staff members about material matters. There are other days where we have three or four conversations about a variety of different issues.

Q Okay. How often do you meet with the medical director of PFC?

A We have regular interactions. I see her daily. I would say I probably meet with her at least weekly on at least one issue, but we have regular coordination.

MS. LANGLEY: Okay. I'm going to share my screen and ask the court reporter to mark this document as Exhibit 2.

(MIRANDA Exhibit Number 2 was marked for identification.)

Q And you are the person who makes the recommendation of whether an officer can return to full duty or is referred to the disability retirement board, correct?

A No, that is not correct. Duty status decisions are made exclusively by the medical providers at the police and fire clinic.

Our role with respect to disability retirement is simply administrative. Pursuant to the statute, when an individual crosses the threshold of the 172, their case is referred over to -- to the retirement board.

But MPD -- neither MPD nor myself make duty-status-related decisions on members.

Q Okay. So a medical provider makes a determination within or at the 172-day mark that an officer can return to full-duty status.

What then do you do?

MR. SOBIECKI: Objection to form. Misstates prior testimony.

You can answer.

THE WITNESS: Yeah. Again, just to

clarify, when a member has an illness or an injury, they come into the PFC if that's a performance of duty -- their injury -- they are receiving their treatment of care. The vast majority of the injuries or illnesses reported to the PFC resolve within a significantly shorter time frame than the 172.

Most people will -- most injuries will -- will -- will resolve within a one, you know, withing a one- to two-month time period. And when the member's injuries have successfully resolved, they put their duty status to full duty, and they return to the workplace.

BY MS. LANGLEY:

Q And so there is nothing that you as director of medical services division does when the PFC medical provider indicates the change in duty status that an officer can return to full duty?

A No. There is nothing that we get involved in at all. We send out daily reports that have the list of people who are in a

less-then-full-duty status, and, you know, in those daily reports, when -- when they are less-then-full-duty status, they show up, or when they return to full duty, we send out those reports, and the member returns back to work.

Q Okay. So then let's say a PFC medical provider has indicated that an officer is not MMI -- I think you said the acronym is -- they've reached 172 days.

What do you do then?

A Well, the PFC will, during this process, perform a IDE, a disability exam, independent disability exam, which will include a chronology of the history of the illness or injury in question, an exam with the member at the time, and any prognosis for recovery that may be available given the information that is -- that is available.

The PFC will put that into a memorandum that will be addressed to the retirement board. My role in that process is to simply to review and sign that document to ensure the accuracy of the

information therein contained.
Q Okay. I think we'll get to more of that a little later.
Just to make sure I understand the roles and responsibilities of the medical director under the medical services policy, it also -- that policy mentions that on a weekly basis you are supposed to provide the assistant chief OHS a list of members who are placed on sick leave; is that correct?
A Yes. With the caveat that OHS is not an entity that exists anymore through a series of realignments, which, again, occurs when, you know, you have an order that was written a number of years ago.
That being said, there are daily reports which go out to all of the commands that show members who are in a less-then-full-duty status which include the sick, so those daily reports meet that and actually exceed that requirement.
Q Okay. And just so I'm clear, those daily reports, in addition to officers on sick leave and limited-duty status, the daily reports

also include members who have been released by the clinic to return to full-duty status?

A Correct, ma'am.

Q Okay. Well, it also says on a weekly basis that the medical services director should provide the assistant chief of whatever OHS is now a list of folks -- a list of officers that have been recommended for disability retirement.

Is that true?

A Not that I'm aware. I -- I would need to see that. I'm not sure that that -- where is that coming from?

Q I'm going to pull up Exhibit 3 again. So this is --

A If it's not in there. I just don't recall.

Q Of course. This is -- where did it go? This is section N, roles and responsibilities, subsection 4, the medical services director.

A Yeah. Oh, there it is, 4. I think at the top, recommend for disability retirement order.

Yeah. In -- in practice, that is not the case, which, again, you are going to have some slight deviation from practice and policy as orders continue to age.

Yeah, again, number 1, the office of the OHS -- I honestly don't even know what that stands for but -- is -- is no longer in existence, and we do not provide weekly disability recommendations. Again, we do not do that.

Q Okay. What about monitoring duty status to determine when members should be referred to the retirement board? How do you do that?

A That's tracked both by the police and fire clinic and by MPD.

On our daily reports, to the right-hand column there is a tracker which indicates the number of workdays that an individual has been in that less-then-full-duty status. And so those daily reports provide a regular update for us on -- in order to flag members who may ultimately cross that threshold, and that the PFC uses it for the same purpose.

A I tweaked my version, yes, ma'am.
Q Okay. And what is the importance of sending these letters?
A Sure. The 86-day letter serves as a notice of both rights and responsibilities for members who may come under the purview of the retirement board pursuant to the statute.
The principal objective is primarily educational based to provide them with information and resources if they have questions.
Q What rights does the 86-day letter describe?
A As it stands -- as it stands now, the 86-day letter affords -- outlines several rights that they have, including the fact that they will be represented by an attorney during the process.
It provides them a referral and reference to ADA if they have issues related to accommodations and provides our phone number if they have any questions or issues.
It provides them the rights of the calculation for disability retirement that they

would get, if in fact they were ultimately to -- to go through the entire disability retirement process. And that's pretty much it.

MS. LANGLEY: I am going to share my screen and ask the court reporter to mark this document as Exhibit 8.

(MIRANDA Exhibit Number 8 was marked for identification.)

BY MS. LANGLEY:

Q Can you see that, Mr. Miranda?

A I can.

Q Do you recognize what this document is?

A Yep. It looks to be an 86-day letter from 2015.

Q Is this a fair representation of what 86-day letters looks like?

A Yes. That looks like the version they were using in 2015, yes.

Q And is there a difference in versions over the years?

A I would imagine they undergo edits every number of years.

Q Okay. So somewhere between 86 days and the 120 days of an officer being in less-then-full-duty status, other things happen -- well -- I'm sorry, strike that.

Somewhere between 86 days and 120 days the PFC and MSD engage in other processes; is that right?

MR. SOBIECKI: Object to form.

THE WITNESS: I'm not sure what you're referring to.

BY MS. LANGLEY:

Q Okay. I'll just ask it more simply.

You mentioned earlier that 86 days and between 120 and 130 days are intervals that you keep your eye out for on the daily reports, right?

MR. SOBIECKI: Objection. Misstates prior testimony.

You can answer.

THE WITNESS: Yes. And so if you're asking are we doing things between 86 and 120, not necessarily. The member is continuing to get treatment to recover from their injury. Obviously,

there is a process where we begin to schedule them for IDEs between day 120 and 130, and that's when we would work with the PFC on.

BY MS. LANGLEY:

Q And can you walk me through what that looks like in terms of working with PFC to schedule these initial disability evaluations?

A Well, again, you know, the PFC takes the lead and we also, you know, keep -- keep an eye on that. They will -- when a member gets to, sometimes generally speaking, between 120 and 130, they will send out a scheduling notice to get the member scheduled.

We will communicate with the member, most often by email, to let them know when their dates are scheduled. And if we, you know, see someone who is within that time frame without an IDE appointment, we will reach out to PFC to ask them to coordinate scheduling of that appointment. It's a very basic and basic scheduling endeavor.

Q Also seems pretty collaborative, doesn't it?

MR. SOBIECKI: Object to form.
You can answer if you understand the question.
THE WITNESS: I don't.
BY MS. LANGLEY:
Q I'm having a hard time understanding what PFC does and what you do, because you say we.
So let me just ask a few clarifying questions.
PFC creates a scheduling notice?
A Uh-huh. Yes. They monitor the list just like we monitor the list. When they see someone who falls -- who falls within that time period, they will look at the schedule, develop an appointment, and send out an appointment notice, and then we will contact the member and provide that appointment notice, make sure it doesn't fall on their days off or while they are on vacation or those kind of issues. And then they'll be scheduled for the appointment.
Q And who communicates with the officers often by email about their initial disability

evaluation scheduling?
A Usually one of our sergeants.
Q Okay. Now, previously, going back a little bit to PFC, you had mentioned your PFC and MSD are co-located.
Could you specify what you mean by that?
A Sure. Our offices are in the same building.
Q And what building is that?
A Police and fire clinic on 920 Varnum Street, Northeast.
Q And is your office relatively close to the medical director of PFC's office?
A We are on the same floor.
Q Okay. So at about the 100 -- the 120- the 130-day range, officers are scheduled for their initial disability evaluation, right?
A Correct.
Q And what is an initial disability evaluation?
A It is a medical examination that looks at the current condition of the member relative to

the injury or illness involved, history of their treatment, overall history of their -- of any relevant past issues which could medically impact, you know, their current condition, and, you know, an evaluation of where they currently are in their recovery.

Q Okay. Are physical demand codes used during the initial disability evaluation?

A I'm sorry? You kind of broke up there. Are what kind of codes?

Q Are physical demand codes used during the initial disability evaluation?

A Physical demand code. I don't know if I am familiar with that term.

Q Okay. Do you know who would be familiar with that term?

MR. SOBIECKI: Object to form.

THE WITNESS: No, because I don't know what the term means. I don't know what you're referencing.

BY MS. LANGLEY:

Q Well, then what is the purpose of the

initial disability evaluation?

A It serves as the foundation to the document that will ultimately be produced referring the member to disability retirement if necessary.

Q Okay. Also around this time, is it true that -- I'm sorry.

Also around the 120/130-day mark of being in less than fully duty status, PFC schedules a labor market survey for officers, right?

A Correct. That usually occurs shortly after the IDE exam.

Q Is there a reason why the IDE has to happen first?

A No.

Q What is a labor market survey?

A Labor market survey is an assessment of work and working conditions that an individual could participate in given any current limitations as a result of their injury or their illness.

Q And what are labor market surveys used for?

treatment during that period of time in hopes of making a full recovery.

BY MS. LANGLEY:

Q Do you know if HR plays any role during this time when an officer is in their active treatment phase?

A No.

Q Well, I guess I should change my question.

Does HR play any role between day 1 and day 86 of an officer being in less-then-full-duty status?

MR. SOBIECKI: Object to form.

THE WITNESS: No.

BY MS. LANGLEY:

Q Does HR play any role between day 86 and day 130 when an officer is in less-then-full-duty status?

A No.

Q And what about day 120 to 172?

A No.

Q Okay. So what happens after the initial

disability evaluation and labor market surveys are completed?

A The doctors will use the information provided from the IDE to craft a memo to the retirement board for the -- for the referral pursuant to the statute.

And obviously, during that time the member will continue, assuming for POD injuries, to receive active treatment from the -- from the PFC. Again, in hopes of obtaining a full recovery.

Q And as director of medical services do you do anything during this time after initial disability evaluation and labor market surveys are completed?

A Not specifically, no.

Q When you say not specifically, is there anything that's specific -- not -- not specific?

A No. No, not necessary, no. Again, there is a -- from time and again a member may contact us and ask questions, you know, where is my case going. I heard I was going to be back in a few months.

You know, but, you know, generally outside of responding to inquiries, you know, from members with questions, which is rare, there is no active role that we have in the process at that time.

Q Okay. And what does MSD -- when you all receive inquiries for members like that, how do you help members understand where they are in the process?

A How specifically are you -- what specifically are you asking?

Q You mentioned that sometimes during this phase after initial disability evaluations and labor market surveys are completed that members may sometimes contact MSD and inquire about where their case is.

So my question was how does MSD help members understand what's going on with their case?

A Again, that's -- that's extraordinarily rare, you know, for that to occur during that time period.

Yeah. I think it may have happened once during my tenure where -- where someone asked, and

it was mostly because they were in the process of getting, you know, cleared from their doctor, and they had not yet reached the 172 day -- 172-day threshold.

Q Okay. And --

A But there is typically no active role that we play in the process between the IDE and LMS and the completion of the memo. I think that was your fundamental question. I think that's probably a more straightforward answer then -- straightforward way to answer that question.

Q Okay. And so MSD gets involved once you receive the disability referral memo from the PFC provider?

A That is correct.

Q Is there anyone else responsible for reviewing the disability referral memo other than yourself?

A Yes. The PFC medical director reviews and approves it. It is -- it's authored by the person who conducted the IDE. It is reviewed by the PFC medical director. It is reviewed for

format and processed by an administrative member of the PFC team, and then it is reviewed by me.

Q Okay. And do you review just the disability referral memo or do you review the full file that you send to the retirement board?

A No. Primarily just the -- just the memo itself.

Q And why do you have to review these disability memos?

A Pursuant to statute, MPD is required to refer them over at 172 days. Obviously, accuracy and completeness is an important part of that process, and so I review for accuracy and completeness.

Q How often do you have to send it back to PFC because it's accurate or complete?

A Not often.

Q Would you say less than five times a year?

A Yes.

Q Would you say less than two times a year?

administrator for which we are obligated to continue to provide medical care for them in retirement.

And so as part of our role in knowing who falls under the TPA program, we receive those as well. Notifications.

Q Okay. And what does TPA stand for again?

A Third party administrator.

Q Do you -- I'm sorry. Strike that.

What do you do with these decisions -- I'm sorry. Strike that.

Do you file these decisions somewhere?

A Just electronically.

Q Okay. Is the information put into Centricity?

A The retirement order may be scanned into Centricity.

Q What other kind of documents are scanned into Centricity?

A Outside of medical records, potentially the 86-day letter and POD determinations are

probably the only nonmedical information that we would scan. And then relevant retirement board documents would be scanned into Centricity by the PFC.

MS. LANGLEY: Okay. I'm going to share my -- hold on a second. I'm going to share my screen and ask the court reporter to mark this as Exhibit 9.

(MIRANDA Exhibit Number 9 was marked for identification.)

BY MS. LANGLEY:

Q Can you see that, Mr. Miranda?

A I can.

Q Are you familiar with this document?

A I am.

Q This is the District of Columbia Police Officers and Firefighters Retirement Plan?

A Uh-huh.

Q It is a long document.

A It is.

Q This document says, summary plan description 2017. To your knowledge is there a

but yeah, that would very likely -- that would have been medical services.

Q Okay. How did MSD go about compiling the information used in this spreadsheet?

A Well, number one, we looked at everyone who was disability retired over that time. There were HR separation reports that contain, you know, the names and units of individuals who separated and the manner in which they separated.

And then the rest of the information was looked up manually in their respective charts.

Q So the information was looked up in physical files?

A Centricity.

Q Do you know who from MSD collected the information from Centricity to input into this spreadsheet?

A I don't. I don't.

Q If you were using Centricity and having to pull this information, are there steps you would take?

A Well, again, I'd look at the fields of

data that are required, and then you'd have to go in each chart and look for a different place. You'd have to look in a different place for all the different pieces of information.

Nature of injury is usually going to be contained either in the 42 that's been scanned in there, or it's going to be in their first visit, a summary of the notes -- summary of the notes from their first visit.

Percentage of disability was going to be in the disability order issued by PFRRB. That's a separate document.

You know, duty status again, separate. There's a specific tab you have to open to review duty status, so it's a largely manual process.

Q When you say you go into the charts, you're talking about for each officer?

A Correct.

Q So on Centricity each officer has an electronic file?

A Correct. It's actually a medical record, but yes.

MR. SOBIECKI: Object to form.
THE WITNESS: Very rarely. I would say not even once a month.
BY MS. LANGLEY:
Q And once a month --
A I'm sorry. Just to clarify, I would probably say barely once every two months.
Q And barely once every two months, what kind of reports do you pull?
A It would just be a daily duty status report, which is the same report that my sergeants pull and email out to everyone every morning.
Q Gotcha. Does anyone provide you any reports on certain intervals besides the daily duty reports?
A The daily duty report is -- reports, which contain three different documents, are largely the only reports that are automated in Centricity. The only other report that we would pull, I wouldn't get but would generally be pulled as a list of people who would get biennial physicals and in compliance with biennial