# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| STEVE PAPPAS, *et al.*, | : | | |
| Individually and on behalf of all others | : | | |
| similarly situated, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-2800 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 62, 74 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY A CLASS AND APPOINT CLASS COUNSEL; DENYING AS MOOT DEFENDANT'S MOTION TO STRIKE

## I. INTRODUCTION

Plaintiffs Steve Pappas, Tawana Lindsay, Nichole Mathies, and Malachi Malik—on their own behalf and on behalf of a proposed class of similarly situated individuals—sue the District of Columbia and Pamela A. Smith,[1] in her official capacity as the Chief of Police of the Metropolitan Police Department of DC, (collectively "DC") for violating the Americans with Disabilities Act, 42 U.S.C. §§ 12111-117.  Before the Court is Plaintiffs' Motion to Certify a Class and Appoint Class Representatives and Class Counsel, ECF No. 62 ("Mot. to Certify"). DC filed a response in opposition, ECF No. 67 ("Opp."), to which Plaintiffs filed a Reply, ECF No. 73.  For the following reasons, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' Motion to Certify.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the current Chief of Police of the Metropolitan Police Department of DC, Pamela A. Smith, is substituted as Defendant for the former Chief of Police, Robert J. Contee III.  *See* Fed. R. Civ. P. 25(d).

## II.  BACKGROUND

Plaintiffs served as police officers in the DC Metropolitan Police Department ("MPD"). Third Amended Complaint ¶¶ 8–12, ECF No. 70 ("Third Compl.").  Each Plaintiff alleges that he or she was involuntarily retired from MPD pursuant to the department's involuntary disability retirement policy.  *Id.* ¶¶ 29–81.  Under MPD's policy, police officers "who cannot resume full-duty status after 172 cumulative workdays over any 24-month period as a result of any disability" are involuntarily disability retired.  *Id.* ¶ 17.  MPD does not offer the "possibility of reassignment, job restructuring, or extended leave" as an alternative to involuntary disability retirement.  *Id.*

The disability retirement process works as follows: First, a police clinic staffed by doctors monitors MPD officers with injuries or illnesses on behalf of the department to determine whether those officers are able to serve in a full-duty capacity; Second, after an officer has accumulated 172 days of less than full duty service in a 24-month period, the clinic refers the officer to MPD's retirement board; Third the retirement board holds a hearing—at which a physician testifies and explains why the officer is not able to return to full-duty work—and the board makes a final determination on whether to retire the officer and what benefits the officer may receive.  *Id.* ¶¶ 22–27.  At no point during this process does DC assess whether an officer is eligible to be reassigned as a reasonable accommodation for his or her disability in lieu of involuntary disability retirement.  *Id.* ¶ 28.

Plaintiffs contend that their retirements from MPD were involuntary and that they would have preferred to keep working with a reasonable accommodation for their disabilities, had that been an option.  *Id.* ¶¶ 29–81.  Accordingly, Plaintiffs contend that MPD's involuntary disability retirement policy violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-

117.  *Id.* ¶¶ 111.  Among other provisions, the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . discharge of employees."  42 U.S.C. § 12112(a).  As defined by the ADA, discrimination against employees includes an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).  "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Plaintiffs believe that MPD's involuntary disability retirement policy constitutes discrimination as defined by the ADA and brought this suit against DC on their own behalf and on behalf of a class of former and current MPD officers who have been subject to MPD's involuntary disability retirement policy.  Third Compl.  ¶¶ 100–104.  Plaintiffs seek to certify an overall class comprised of:

> All current and former employees of Defendants who were employed as MPD sworn law enforcement officers at any time between December 9, 2014, and the date that class certification is granted who developed a physical or mental disability and were referred to the Police and Firefighters Retirement Relief Board ("Retirement Board") for disability retirement even though Defendants never determined their suitability for extended leave, job restructuring, and reassignment and who were disability retired or whose Retirement Board decision remains pending.

*Id.* ¶ 84.  Plaintiffs also seek certification of two subclasses.  *Id.* ¶¶ 85–86; Pls.' Mem. Supp. Class Cert., ECF No. 62-1 ("Mem. in Support") at 17.  The first proposed subclass includes "all Class Members who were disability retired as MPD sworn law enforcement officers between December 9, 2014 and June 30, 2017."  Third Compl. ¶ 85.  The second proposed subclass

includes "all Class Members who were referred for disability retirement between July 1, 2017 and the date that class certification is granted and who were disability retired or whose Retirement Board decision remains pending." *Id.* ¶ 86.  Because Plaintiffs pursue this litigation not only on their own behalf but on behalf of a proposed class of similarly situated individuals, *see* Mem. in Support at 2, the Court must determine whether to certify Plaintiffs' proposed class.

## III.  LEGAL STANDARDS

When "considering a motion for class certification, a court presumes the allegations in the complaint to be true." *Moore v. Napolitano*, 269 F.R.D. 21, 27 (D.D.C. 2010).  The relevant question upon considering a motion to certify "is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)).  The Court has broad discretion to decide whether the requirements for class certification have been satisfied.  *Id.*; *see, e.g.*, *DL v. D.C.*, 860 F.3d 713, 724 (D.C. Cir. 2017).

## IV.  ANALYSIS

Federal Rule of Civil Procedure 23(a) and (b) sets forth the prerequisites that Plaintiffs must satisfy before the Court may certify their proposed class.  *See* Fed. R. Civ. P. 23.  "When appropriate, a class may be divided into subclasses that are each treated as a class under" Rule 23.  Fed. R. Civ. P. 23(c)(5).  "In considering whether certification of the subclass proposed by plaintiffs is appropriate, the Court must determine whether the subclass satisfies all the prerequisites for maintenance of a class action under Rule 23."  *Bynum v. D.C.*, 214 F.R.D. 27, 41 (D.D.C. 2003); *DL v. D.C.*, 302 F.R.D. 1, 10 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (same); *Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1, 8 (D.D.C. 2018) (subclasses must satisfy *all* of Rule 23's requirements to be certified); *c.f. Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746,

758–59 (D.C. Cir. 2023) (explaining that issue classes are not exempt from the requirements of Rule 23 and that "[u]nder the plain text of Rule 23, all certified classes must meet both the threshold requirements of Rule 23(a) and be maintainable under one of Rule 23(b)'s categories.").  Thus, the Court assesses whether Plaintiffs' overall class and proposed subclasses satisfy the requirements of Rule 23.  The Court assesses the prerequisites of Rule 23(a) and (b) in turn.

### A.  Federal Rule 23(a) Requirements

As a threshold matter, Rule 23(a) comprises four requirements that Plaintiffs must satisfy before the Court can certify their proposed class.  First, a class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Second, there must exist "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Third, "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Fourth, the parties representing the proposed class must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation, respectively.  *See Springs v. Del Toro*, No. 20-3244 (RDM), 2022 WL 741865, at *5 (D.D.C. Mar. 11, 2022).

### 1.  Numerosity

The Court begins with numerosity.  "[A] class is presumptively numerous enough to satisfy the requirement if it includes forty or more members."  *N.S. v. Hughes*, 335 F.R.D. 337, 352 (D.D.C. 2020); *Springs*, 2022 WL 741865, at *5 ("Courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet [the numerosity] requirement." (cleaned up)).  Be that as it may, there is no specific minimum number required for numerosity because the core requirement is that "joinder be impracticable," regardless of how many class

members may exist.  *Coleman v. Dist. of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015); *see also Springs*, 2022 WL 741865, at *5 ("Plaintiffs need not clear any 'specific threshold.'" (quoting *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007)).

Plaintiffs assert that their proposed class would include approximately 100 former and current MPD Officers.  Mem. in Support at 1.  Presumptively, Plaintiffs' class is sufficiently numerous for the Court to infer that joinder would be impracticable.  DC argues, however, that Plaintiffs cannot establish numerosity because "whether each class member is a qualified individual under the ADA will be a separate and independent determination" leading to many "class[es] of one."  Opp. at 20.  DC's argument conflates the requirements of commonality and predominance with the requirement of numerosity.  Numerosity involves the difficulty in joining all of Plaintiffs' proposed class, *Hughes*, 335 F.R.D. at 352, whereas commonality's "inquiry focuses on what characteristics are shared among the whole class," *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 161 (D.D.C. 2014), and predominance requires that "proposed classes are sufficiently cohesive to warrant' class litigation of their substantive claims, rather than bringing individual suits."  *Harris*, 77 F.4th at 762.  DC's focus on the need for independent determinations—rather than the difficulty of joining 100 class members—therefore relates to questions of commonality and predominance rather than numerosity.  And given that Plaintiffs' proposed class would exceed forty members by a wide margin, the Court determines that joinder would be impracticable and that the numerosity requirement is satisfied.  *See, e.g.*, *Springs*, 2022 WL 741865, at *5 (numerosity requirement satisfied because plaintiffs' estimate of class size "well exceed[ed] any floor on the number of potential class members needed to satisfy that re[]q[u]irement.").

Plaintiffs' proposed subclasses also satisfy the numerosity requirement.  Plaintiffs' first subclass, made up of officers who were disability retired from December 2014 to June 30, 2017—and including only 29 members—is a borderline case.  Plaintiff cites to two out-of-circuit cases for the proposition that "the numerosity requirement is relaxed with respect to sub-classes." Mem. in Support at 19.  Because "[i]t is well settled that if subclasses are to be certified, each subclass must independently satisfy Federal Rule of Civil Procedure 23's requirements," however, the Court disagrees that a more relaxed numerosity requirement applies to subclasses. *Marable v. Dist. Hosp. Partners, L.P.*, No. 01-02361 (HHK), 2006 WL 2547992, at *6 (D.D.C. Aug. 31, 2006); *Borum*, 324 F.R.D. at 10 (subclasses must satisfy *all* of Rule 23's requirements to be certified).

Nevertheless, "there is no specific threshold that must be surpassed in order to satisfy the numerosity requirement," *Borum*, 324 F.R.D. at 11 (cleaned up), and classes have sometimes been certified "even if they have fewer than 20 members."  *J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019) (collecting cases); *see also*, 7 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 23:18 (6th ed. 2022) ("[Numerosity] requirement presumptively met with classes consisting of over 40 members, more difficult to meet with classes consisting of fewer than 20 members, and plausibly met . . . for proposed classes of between 20 and 40 members").  Smaller classes are considered sufficiently numerous when the class population "presents non-numerical considerations that might make joinder impracticable," such as "the dispersion of class members across the country, and their limited resources."  *J.D.*, 925 F.3d at 1323.  As Plaintiffs describe, "the officers in Subclass 1 are geographically dispersed" and it appears likely that their resources are limited.  Mem. in Support at 19, Reply at 21; *see also* Decl. of Steve Pappas, ECF. No. 62-28 (stating that Pappas lives in Florida); Decl.

7

of Nicole Mathies, ECF No. 62-30 (stating that Mathies lives in Maryland and is interested in rejoining the workforce).  Moreover, all class members suffer some form of disability, which may limit their resources and make it difficult for class members to sue individually.  *See Coleman*, 306 F.R.D. at 80 (explaining that "the vulnerability of many members of the class renders their claims uniquely unsuited for individual prosecution" and that "Rule 23, in permitting the aggregation of claims, embodies a 'principle of protection for weaker plaintiffs.'" (quotation omitted) (citing to out-of-circuit cases involving disabled plaintiffs)); 2 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:65 (6th ed. 2022) (explaining that courts are more likely to certify small classes where the class is composed of a "vulnerable population"); *McDonald v. Heckler*, 612 F. Supp. 293, 300 (D. Mass. 1985) ("These individuals claim to be *disabled* and of low income.  It is therefore impracticable for these persons to bring individual lawsuits challenging the Secretary's policies." (emphasis added)); *c.f., Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 773 (1989) (Marshall, J., dissenting) ("Congress recognized that victims of discrimination often lack the resources to retain paid counsel, and frequently are unable to attract lawyers on a contingency basis because many victims seek injunctive relief rather than pecuniary damages."); *Bravo v. City of Santa Maria*, 810 F.3d 659, 672 (9th Cir. 2016) (Reinhardt, J., concurring) ("As the cost of litigation increases, it becomes more difficult for civil rights victims to afford competent counsel.").  Additionally, currently employed MPD officers, or former officers who are trying to find alternative DC government employment, may fear retaliation if they sue individually, making individual suits less likely. *See* 7 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 23:18 (6th ed. 2022) ("Because [fear of retaliation in the employment context] might deter potential plaintiffs from suing individually, courts have held that a representative (class) action is especially

necessary, and smaller classes will therefore be tolerated." (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999))).  Accordingly, the Court exercises its discretion and finds that joinder of Plaintiffs' first subclass would be impractical even with as few as 29 subclass members.  *C.f. Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988) ("[C]ertification of such a small class is best left to the sound discretion of the district court").

Plaintiffs' second subclass, made up of officers who were disability retired between July 1, 2017 and the present, is composed of at least 48 members.  Mem. in Support at 19–20.  The second subclass is also geographically dispersed.  *Id.*  As explained above, classes of more than 40 members are presumed to be sufficiently large to satisfy numerosity.  The Court holds that the second subclass here is large enough that joinder would be impracticable and that it is sufficiently numerous to satisfy Federal Rule 23(a)(1).

### 2. Commonality

Next is commonality.  To prove commonality, Plaintiffs must "identify at least one question common to all members of the class."  *Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006).  Plaintiffs may demonstrate a common question by showing that "class members 'have suffered the same injury.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 (1982)).  However, "[t]his does not mean merely that they have all suffered a violation of the same provision of law."  *Id.*  Rather, the class's claims must "depend on a common contention," the truth or falsity of which "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  Whether a defendant maintains a policy or practice that discriminates against every class member in the same way may constitute a common question.  *See id.* at 352–55; *see also Thorpe v. D.C.*, 303 F.R.D. 120,

145 (D.D.C. 2014) (explaining that "plaintiffs must bridge the gap between individual claims of

harm and the existence of a class of persons who have suffered the same injury as that

individual" and that "where plaintiffs allege widespread wrongdoing by a defendant . . . a

uniform policy or practice that affects all class members bridges the gap" (cleaned up)).

"[F]actual variations among the class members will not defeat the commonality requirement, so

long as a single aspect or feature of the claim is common to all proposed class members."

*Stephens v. Farmers Rest. Grp.*, 329 F.R.D. 476, 483 (D.D.C. 2019) (quotation marks and

citation omitted).

Here, Plaintiffs' "common contention" is that DC injured every class member in the same

way by maintaining a policy of forcing disabled officers to retire without first considering

reassignment as an accommodation—in violation of the ADA.  Reply at 2.  In response, DC

contends that the nature of Plaintiffs' claims renders those claims unsusceptible to class-wide

resolution and that, therefore, Plaintiffs' proposed class lacks commonality.  Opp. at 14.

Specifically, DC argues that although there is a *question* common to the class—*i.e.*, whether DC

violated the ADA by failing to offer or consider reassignment—each class member will have a

different *answer* to that question because only "qualified individuals" are protected by the ADA,

meaning that "a classwide proceeding [would not] generate common answers apt to drive the

resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350; Opp. at 16.  In other words, DC says,

each individual plaintiff will need to prove that he or she is a "qualified individual" under the

ADA and the answer to that inquiry cannot be determined collectively.  Opp. at 14.

DC relies in large part on a pre-*Wal-Mart*, Third Circuit case, *Hohider v. UPS*, 574 F.3d

169, 191 (3d Cir. 2009), for its assertion that Plaintiffs' claims cannot be resolved on a class-

wide basis.  Opp. at 14.  In *Hohider*, the Third Circuit held that "analysis of the ADA's

'qualified' standard, if necessary to a determination of classwide liability against [the defendant],
would render plaintiffs' claims unsuitable for certification under Rule 23(a) and (b)(2)."  574
F.3d at 189.  The Third Circuit came to this conclusion because disability discrimination is
unlawful only with respect to qualified individuals, meaning that the question whether an
individual is qualified is crucial to every class member's claim.  *Id.* at 185–86.  Because
qualification was a threshold issue to liability, and would require individual determinations, the
Third Circuit held that there could be no common question.  *Id.*

   While the Court agrees that an individual must be "qualified" to be protected by the
ADA, the Court declines to follow *Hohider* because a common question—and answer—may
exist despite the requirement of some individual determinations.  For purposes of the
commonality requirement, the Supreme Court has admonished that "even a single common
question will do."  *Wal-Mart*, 564 U.S. at 359 (cleaned up).  In other words, it does not matter if
some individual determinations—such as whether individual class members are "qualified"
under the ADA—are required so long as there exists a question the answer to which will help
resolve the entire class's claims.  *See id*.  "[D]etermination of [the question's] truth or falsity
[must] resolve an *issue that is central to the validity of each one of the claims* in one stroke."  *Id.*
at 350 (emphasis added).  Thus, there must be an important *issue* that can be resolved in "one
stroke," but the overall *claim* itself need not be resolved in one stroke.  *C.f. Amgen Inc. v. Conn.
Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (explaining that "a plaintiff seeking class
certification [need not] prove that each element of her claim is susceptible to classwide proof."
(cleaned up)); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (holding that when
one or more of the central issues in the action are common to the class the action may be
considered proper for class certification even though other important matters will have to be tried

separately).  The *Wal-Mart* Court explained that the issue of whether a "general policy of discrimination" exists can be a common question sufficient to justify certification.  564 U.S. at 352–55; *see also* 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW & PRACTICE § 4:7 (20th ed. 2023) ("Commonality is usually satisfied where the same conduct or practice by the same defendant underlies the claims of all putative class members.").  In the wake of *Wal-Mart*, this District's precedents have confirmed that an employer's generally applicable discriminatory policy can form the basis for a common question even where some individual questions remain.

Take, for example, the District Court's opinion in *DL v. D.C.*  In *DL*, the court held that a subclass that had "allege[d] a uniform practice of failure that harmed every subclass member in the same way" had satisfied the commonality requirement.  302 F.R.D. 1, 13 (D.D.C. 2013) (explaining that "class members must have suffered the same injury *for the same reason*, such as a uniform policy or practice that is illegal"), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017); *see also DL v. D.C.*, 713 F.3d 120, 128 (D.C. Cir. 2013) (implying that "Rule 23(a) commonality" can be established if the defendant maintains "a uniform policy or practice that affects all class members."); *DL*, 860 F.3d at 725 (holding commonality satisfied because plaintiffs could show that DC's overarching policy failed to conform to the IDEA and holding that individualized determinations about class members did not defeat commonality); *Stephens*, 329 F.R.D. at 483 (holding that it was "more than sufficient to meet the commonality requirement" when class members "were subject to the same work policies and practices" (internal quotation marks omitted)).

*DL* involved children with various disabilities who brought a class action against the District of Columbia alleging that the District failed to provide them with appropriate public

education, in violation of the Individuals with Disabilities Education Act.  *See* 302 F.R.D. at 6.
The court held that each of the plaintiffs' proposed subclasses satisfied the commonality
requirement because "[e]ach proposed subclass poses the question whether the District's policies
were adequate to fulfill a specific statutory obligation under the IDEA.  Stated differently, each
subclass alleges a uniform practice of failure that harmed every subclass member in the same
way."  *Id.* at 12–13.  Moreover, the court observed that "[w]here there is a statutory obligation to
act, there is a significant difference between challenging the inadequacy or complete failure to
enact policies and procedures and alleging an erroneous application of a policy to individuals."
*Id.* at 13.  Because the plaintiffs in *DL* challenged the District's overall generally applicable
policy for failing to satisfy the requirement of the IDEA, the court held that the IDEA's
requirement of individually-tailored accommodations did not defeat commonality.  *Id.* ("The
plaintiffs do not seek to litigate the merits of individual, fact-specific IDEA claims—whether a
particular IEP was sufficient, for instance—but whether the District generally met its statutory
obligations to disabled children under the IDEA.").

The District Court's opinion in *Thorpe* also provides helpful guidance.  303 F.R.D. 120.
In *Thorpe*, disabled individuals who received Medicaid-funded long-term care services filed a
putative class action against the District alleging that they were segregated from their
communities by being confined to nursing facilities and had failed to receive transition services
to community-based care, in violation of the ADA and Rehabilitation Act.  *Id.* at 124–127.
Assessing commonality, the court held that the plaintiffs' case raised a number of common
questions, satisfying *Wal-Mart*'s standard, because the plaintiffs had alleged that the District
injured every class member "by virtue of its failure to implement" a policy that would comply
with the requirements of the ADA.  *Id.* at 145–46; *In re D.C.*, 792 F.3d 96, 100 (D.C. Cir. 2015)

(upholding class certified in *Thorpe* on interlocutory review); *Brown v. D.C.*, 928 F.3d 1070, 1079–82 (D.C. Cir. 2019) (analogizing to *DL* and concluding that plaintiffs in *Thorpe* satisfied commonality requirement because plaintiffs alleged that the District had a deficient policy that violated ADA). In short, the plaintiffs' challenge to the District's overarching policy failure generated a common question the answer to which would drive the litigation.

Circuit courts have found commonality in the ADA context under analogous circumstances as well. The Seventh Circuit's opinion in *Lacy v. Cook County* is instructive. 897 F.3d 847 (7th Cir. 2018). *Lacy* involved a lawsuit brought by disabled detainees against an Illinois county alleging that structural barriers at county courthouses violated the ADA. *Id.* at 854. Contesting certification, the defendant argued "that the reasonableness of a given accommodation will vary for each class member, making it impossible for the litigation to generate common answers." *Id.* at 865. The defendant also argued that "commonality [wa]s undermined by the plaintiffs' need to prove on an individual basis *whether each class member is actually disabled under the ADA*." *Id.* at 865 n.37 (emphasis added). The Seventh Circuit rejected both arguments.

The Seventh Circuit explained that "[a]lthough it is true that the reasonableness of a given accommodation will vary among individuals with differing disabilities, any dissimilarities among the proposed class members will not impede the generation of common answers" because the class members "all complain about the same failure to implement and enforce policies that would accommodate" them. *Id.* at 865–66. Moreover, the Seventh Circuit held that the issue of whether individual class members were disabled under the ADA did not preclude commonality. *Id.* at 865 n.37; *see also Bennett v. Dart*, 53 F.4th 419, 420 (7th Cir. 2022) (reversing district court decision to decertify class based on fact that "some class members, although using aids

such as wheelchairs, may not be disabled within the meaning of the federal statutes" because class could be certified with respect to specific issue).

The Ninth Circuit's opinion in *Armstrong v. Davis* is similarly instructive.  275 F.3d 849 (9th Cir. 2001).  In *Armstrong*, disabled prisoners and parolees brought a class action against various California governmental bodies, including a parole board, alleging that the board's policies and practices for parole proceedings violated the ADA and the Rehabilitation Act.  *Id.* at 854–855.  Specifically, the plaintiffs alleged that the parole process did not accommodate their disabilities.  *Id.* at 862–63.  In response to the plaintiffs' motion for certification, the board argued that the "wide variation in the nature of the particular class members' disabilities preclude[d] a finding of commonality."  *Id.* at 868.

Rejecting the board's argument, the Ninth Circuit held that "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality" because all of the plaintiffs "suffer[ed] similar harm from the Board's failure to accommodate their disabilities."  *Id.*  The Ninth Circuit rejected the board's argument that "separate representative lawsuits should be filed by the hearing impaired, the vision impaired, the developmentally disabled, the learning impaired, and the mobility impaired," and explained that "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."  *Id.*; *see also Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) ("What makes the plaintiffs' claims suitable for a class action is the common allegation that the [agency's] procedures [are] insufficient.").

District court opinions from other districts have also concluded that "factual differences regarding [a plaintiff's] disabilities [in an ADA case] do[] not defeat commonality."  *Bumgarner v. NCDOC*, 276 F.R.D. 452, 456 (E.D.N.C. 2011); *see also Hendricks-Robinson v. Excel Corp.*,

164 F.R.D. 667, 670 (C.D. Ill. 1996) (certifying a disability discrimination class of employees terminated pursuant to an official "medical layoff policy" because each was subject to policy and plaintiffs did not need to address individual injuries); *Bates v. United Parcel Serv.*, 204 F.R.D. 440, 446 (N.D. Cal. 2001) (finding common issues even where some individual inquiries would be required because plaintiffs challenged defendant's accommodation process as violative of ADA).  In *Bumgarner,* disabled inmates at a North Carolina prison filed a class action against the North Carolina Department of Corrections alleging that their prison had excluded them from a sentence reduction program because of their disabilities, in violation of the ADA.  *Burmgarner*, 276 F.R.D. at 455.

The district court held that the differences among the class members' disabilities did not preclude commonality because there existed several questions common to the class, such as whether the North Carolina prison's policies "denie[d] disabled inmates the benefits of sentence reduction credit programs."  *Id.* at 457; *see also Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 336 (D. Conn. 2000) (holding that plaintiffs satisfied commonality requirement even though it was "conceivable that there might be an individual" class member who did not qualify as disabled under ADA where policy generally harmed the class); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 418–19 (S.D.N.Y. 2012) (putative class of disabled individuals met commonality requirement for certification in suit alleging city's emergency plan was discriminatory in violation of ADA, even though plaintiffs had "diverse disabilities and will not all be affected by the alleged omissions in the City's plan the same way," because city-wide policy at issue would, in some way, affect all of disabled residents); *Ball v. Kasich*, 307 F. Supp. 3d 701, 719 (S.D. Ohio 2018) (finding commonality where class challenged Ohio disability

policy). Thus, the fact that the ADA only protected inmates who fell under the ADA's definition of disabled did not preclude commonality.

Similarly, in *Davis v. Astrue*, the Northern District of California held in a Rehabilitation Act[2] case that individualized determinations about the plaintiffs' disabilities did not preclude class certification. 250 F.R.D. 476, 487 (N.D. Cal. 2008). The plaintiffs in *Astrue* sought to certify a class of individuals with mental disabilities who had been denied "meaningful access" to social security benefits. *Id.* The defendant argued that a class should not be certified because "'meaningful access' . . . must be determined on a case-by-case basis" and, thus, the plaintiff's proposed class would require "individualized determinations based on the specific disabilities of each potential class member." *Id.* at 486. The district court disagreed.

While acknowledging that the Rehabilitation Act required the agency to make individual determinations, the court held that it could rule on the agency's overarching policy and practice without the need for *the court* to make any individualized determinations. *Id.* at 487. The district court explained that "[a] contrary holding here would essentially preclude a plaintiff from bringing any class action under the Rehabilitation Act. Yet, courts have held that class actions under the Rehabilitation Act are appropriate." *Id.* at 487 (collecting cases).

---

[2] Because the Rehabilitation Act served as a model for the ADA, courts often apply Rehabilitation Act caselaw to the ADA setting. *See, e.g.*, *Brown*, 928 F.3d at 1088 (Wilkins, J., concurring) ("My colleagues and I agree that the substantive standard for the ADA and Rehabilitation Act claims is the same"); *Bolton v. Scrivner*, 36 F.3d 939, 943 (10th Cir. 1994) ("The legislative history of the ADA indicates that Congress intended that the relevant caselaw developed under the Rehabilitation Act be generally applicable to the term disability as used in the ADA." (cleaned up)); *see also* 9 LEX K. LARSON & KIM H. HAGAN, LARSON ON EMPLOYMENT DISCRIMINATION § 154.04 (2023) (noting the "judicial borrowing that has been sanctioned between the Rehabilitation Act and the ADA").

The same reasoning applies with respect to DC's argument here: if the question of

qualification precluded commonality, there could never be a class action in an ADA

accommodation case.  But courts have certified classes in ADA accommodation cases.  *See, e.g.*,

*Armstrong*, 275 F.3d 849; *Lacy*, 897 F.3d at 866 n.38 (7th Cir. 2018) ("We note that many courts

have certified classes based on allegedly unreasonable accommodations."); *see also Lane v.*

*Kitzhaber*, 283 F.R.D. 587, 596 (D. Or. 2012) ("[A]fter *Wal-Mart*, several courts have certified

class actions in ADA or Rehabilitation Act cases.").

More importantly—and consistent with the caselaw described above—Plaintiffs can

establish commonality because they have alleged that DC has engaged in a uniform

discriminatory "policy or practice" that has harmed each of them in the same manner: namely,

Plaintiffs allege that DC maintains a policy of failing to consider providing disabled officers with

a reassignment accommodation, contrary to its obligations under the ADA.[3]  And Plaintiffs

assert that each class member is qualified.  *See* Third Compl. at ¶¶ 44–47, 56–57, 79–81, 102,

106, 120–122.[4]  Every class member has, therefore, suffered the same injury: the violation of

---

[3] DC argues that the ADA does not require it to "canvass every agency within the entire
government when determining if reassignment is an option."  Opp. at 2.  DC's obligations under
the ADA go to the merits of Plaintiffs' claims and are not dispositive on a motion to certify.  *See*
*Moore v. Napolitano*, 269 F.R.D. 21 (D.D.C. 2010); *see also Eisen v. Carlisle & Jacquelin*, 417
U.S. 156, 177–78 (1974) (preliminary inquiry into merits of case improper on certification).

[4] Determining whether each class member is a qualified individual with a disability may
be less difficult than DC suggests.  Although DC explains that "disability" in the context of its
disability retirement policy "does not have the same meaning as 'disability' when used in Title I
of the ADA," Opp. at 4, it is plausible that every officer who is disability retired may qualify as
disabled under the ADA.

This is so because "'disability' means, with respect to an individual—(A) a physical or
mental impairment that substantially limits one or more major life activities of such individual;
(B) *a record of such an impairment*; or (C) being *regarded as having such an impairment*."  42
U.S.C. § 12102(1).  Each disability-retired officer undergoes an MPD medical examination
assessing their disability status before they are disability retired, Mem. in Support at 4–5—which
likely constitutes either "a record of such impairment" or "being regarded as having such an
impairment," *see Adams v. Rice*, 531 F.3d 936, 946 (D.C. Cir. 2008) (explaining that "record of

that class member's right to be considered for an accommodation under the ADA.  Unlike in

*Wal-Mart* where the Court found no significant proof that the employer had a company-wide

practice of discrimination, Plaintiffs here offer proof that DC has a disability retirement policy,

and that the policy discriminates against disabled officers.  *See Wal-Mart*, 564 U.S. at 350.  And

the answer to whether MPD was required to consider reassignment for qualified individuals will

drive the resolution of this litigation.

Defendant's own preferred framework for resolving ADA cases helps clarify the

common question here.  DC states that "a plaintiff must establish by a preponderance of the

evidence that (1) she was a qualified individual with a disability, (2) the employer had notice of

her disability, and (3) the employer denied her request for a reasonable accommodation."  Opp.

at 14 (cleaned up).  Although individual determinations may be necessary to answer the first

question, class-wide adjudication can provide the answer to the third question.  And the answer

---

such impairment . . . will often involve tangible documents of some kind, such as medical reports
or employment forms detailing a previous medical condition" that "show that [plaintiff's] alleged
impairment 'substantially limit[ed] one or more . . . major life activities'" (citation omitted));
*Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1316 (11th Cir. 2019) ("In
'regarded as' cases, a plaintiff must show that the employer knew that the employee had an
actual impairment or perceived the employee to have such an impairment at the time of the
adverse employment action."); *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016)
(explaining that "for a plaintiff alleging disability discrimination to show that the employer
regarded h[er] as having an impairment, the plaintiff must show that (1) [s]he has an actual or
perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer
was aware of and therefore perceived the impairment at the time of the alleged discriminatory
action.").

The phrase "major life activities" is defined broadly and includes activities that police
officers must be able to perform.  42 U.S.C. § 1202(2)(A)–(B) ("major life activities include, but
are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,
walking, standing, lifting. . . . a major life activity also includes the operation of a major bodily
function, including but not limited to, functions of the immune system, normal cell growth,
digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and
reproductive functions.").  Accordingly, it is likely that the only individual determination is
whether class members are "qualified" to perform an open position—not whether they are
disabled within the meaning of the statute.

to that third question will either help every class member or doom every class member's claim. Consider, for instance, that DC may be able to prove that it did not maintain the discriminatory policy that Plaintiffs say it did and that, in fact, it did assess whether MPD officers could be accommodated—thereby answering the third question in the negative.  If that were to occur, Plaintiffs would all be unable to prevail.  *See, e.g.*, *Amgen*, 568 U.S. at 470 n. 5 ("The fact that such a failure of proof resolves all class members' claims once and for all, leaving no individual issues to be adjudicated, confirms that the original certification decision was proper.").  The third question, therefore, will necessarily drive the litigation.  Because class-wide adjudication can provide an "answer[] apt to drive the resolution of the litigation," *Wal-Mart*, 564 U.S. at 350, Plaintiffs satisfy the commonality requirement.  The fact that some individual questions remain if DC cannot rebut Plaintiffs' evidence with respect to the third question does not defeat commonality.

### 3. Typicality

The claims Plaintiffs allege are also typical of the class's claims.  "The purpose of [the typicality] requirement is to assess whether the action can be efficiently maintained as a class [action] and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented."  *Rogers v. Lumina Solar, Inc.*, No. 18-CV-2128 (KBJ), 2020 WL 3402360, at *5 (D.D.C. June 19, 2020) (internal quotation marks omitted).  Typicality "is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability."  *Id.* (citation omitted). "The Rule requires that the named plaintiffs' claims be typical, not identical, and as such, this Court has found the typicality requirement satisfied where at least one named plaintiff has a

claim relating to each challenged practice for which relief is [sought]." *DL*, 302 F.R.D. at 14 (internal quotation marks omitted); *Borum*, 324 F.R.D. at 16 (Typicality is used to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." (quoting 7A CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1764 (3d ed. 2017)).

Here, Plaintiffs' claims arise from their contention that DC did not consider reassignment as an accommodation for each Plaintiff or class member.  Each of the named Plaintiffs worked as an MPD police officer and each was disability retired without being offered reassignment as an accommodation; the proposed class would be composed of police officers who have been disability retired, or are currently subject to the disability retirement policy, without the option of reassignment.  Although the precise details of each class member's disability and retirement hearing may differ slightly, Opp. at 19, each class member "possess[es] the same interest and suffer[s] the same injury"—lack of a reassignment accommodation—as all other class members. *Falcon*, 457 U.S. at 156; *see also Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3 (D.D.C. 2010) ("A plaintiff's claims can be typical of those of the class even if there is some factual variation between them. . . . At bottom, a class representative's claims are typical of those of the class if the named plaintiffs' injuries arise from the same course of conduct that gives rise to the other class members' claims." (cleaned up)).[5]   The named Plaintiffs' claims are not "markedly

---

[5] Although DC argues that Plaintiff Pappas's claim is not typical of the class because he was offered a job by MPD, Opp. at 19 n. 2, a class can be certified if "there remains at least one named Plaintiff who satisfies typicality." *Hoyte v. D.C.*, 325 F.R.D. 485, 497 (D.D.C. 2017).  It is not clear that the difference in Pappas's circumstances is sufficiently different such that his claim is not typical. *See Springs*, 2022 WL 741865, at *6 (typicality exists even if named "Plaintiffs and class members may have been shortchanged to different extents").  However, the

different from that of other members of the class." *Borum*, 324 F.R.D. at 16 (quoting 7A

CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1764 (3d ed.

2017)).  Accordingly, the Court holds that the named Plaintiffs' claims are typical of the claims

brought by the class.

### 4.  Adequacy of Representation

Finally, the Court holds that Plaintiffs are capable of adequately representing the class.

The adequate representation requirement "necessitates an inquiry into the adequacy of

representation, including the quality of counsel, any disparity of interest between class

representatives and members of the class, communication between class counsel and the class

and the overall context of the litigation." *Disability Rights Council of Greater Wash. v. Wash.

Metro Area Transit Auth.*, 239 F.R.D. 9, 28 (D.D.C. 2006) (internal quotation marks and citation

omitted).  The adequacy requirement "mandates an inquiry into the zeal and competence of the

representative's counsel and into the willingness and ability of the representative to take an

active role in and control the litigation and to protect the interests of absentees." *Nat'l Ass'n for

Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1458 (D.C. Cir. 1983).  Fundamentally, the

"adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named

parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625

(1997).

Here, the named Plaintiffs appear capable of "vigorously prosecut[ing] the interests of the

class through qualified counsel." *Lindsay v. Gov't Emps. Ins. Co.*, 251 F.R.D. 51, 55 (D.D.C.

2008).  Plaintiffs appear prepared to pursue this litigation and have employed counsel

---

Court need not decide the issue at this stage, because the other named plaintiffs have claims
typical of the class.

experienced in employment discrimination class actions.  *See* Mem. in Support at 26.  Moreover, the named plaintiffs do not appear to have any conflict of interest with members of the proposed class.  The Court is confident of the adequacy of the class's representation.[6]

\*  \*  \*

Plaintiffs satisfy each of the requirements for class certification imposed by Federal Rule 23(a).  Therefore, the Court proceeds by assessing whether Plaintiffs' proposed class can satisfy the requirements for one of the categories enumerated in Rule 23(b).

### B.  Federal Rule 23(b) Requirements

Plaintiffs assert that their proposed class would satisfy the requirements of both 23(b)(3) and 23(b)(2).  The Court begins with Rule 23(b)(3).

### 1.  Rule 23(b)(3) Class

To certify a 23(b)(3) class, the Court must determine that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Both predominance and superiority are required to satisfy a 23(b)(3) class.

### a.  Predominance

The Court starts with whether common questions predominate over individualized questions.  "The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant' class litigation of their substantive claims, rather than bringing individual suits." *Harris*, 77 F.4th at 762 (citation omitted).  The Court must "give careful scrutiny to the relation between common and individual questions in a case."  *Tyson Foods, Inc.*, 577 U.S. at 453;

---

[6] DC does not appear to challenge this aspect of Plaintiffs' argument.  *See generally* Opp.

*Amchem Prod.,* 521 U.S. at 623–24 (explaining that "the predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement").  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Tyson Foods, Inc.*, 577 U.S. at 453 (quoting 2 W. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50 (5th ed. 2012)).  In short, before certifying, the Court must be convinced that the common issues are "more prevalent or important than the non-common," individual issues.  *Id.* (internal quotation marks and citation omitted).  There is, however, "no magic formula," *Bynum*, 214 F.R.D. at 312, or "definitive test for determining whether common issues predominate," *Arias v. Marriott Int'l, Inc.*, 324 F.R.D. 307, 312 (D.D.C. 2018) (internal quotation marks and citation omitted).

Predominance can be difficult to prove in the ADA employment discrimination context because the ADA contemplates individualized determinations to assess whether an employee is disabled and what a reasonable accommodation would entail.  "When an action requires case-specific inquiries into the facts surrounding each incident of discrimination, which predominate over one common issue—such as whether there was a practice or policy of discrimination—then the class will not be certified."  MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW & PRACTICE § 5:48 at 1751–52 (20th ed. 2023).

The Eighth Circuit's reasoning in *Harris v. Union Pacific Railroad Company* illustrates why predominance is particularly difficult to satisfy in ADA employment cases.  *See* 953 F.3d 1030, 1037 (8th Cir. 2020).  In *Union Pacific*, employees brought a class action against Union Pacific alleging discrimination under the ADA based on a company-wide policy that

automatically excluded from employment employees who disclosed specific health conditions. *Id.* at 1033.  The Eighth Circuit explained that under the text of the ADA, a policy cannot be found discriminatory with respect to specific employees without first making individualized determinations about that employee's capacity to serve in a specific role.  *Id.* at 1035–37 ("Both the text of the ADA and the record evidence demonstrate that the district court would be required to consider the unique circumstances of each position in question to determine whether the policy is unlawfully discriminatory.").  Because important individualized questions would be necessary to resolve each class member's claim, the court held that the common question would not predominate over individual questions and the predominance requirement was not satisfied. *Id.* at 1038.

District Court opinions affirm that "the need for individualized, fact-driven determination under the ADA renders certain ADA actions illsuited" for 23(b)(3) class treatment due to a lack of predominance.  *Street v. Diamond Offshore Drilling*, No. Civ.A. 00-1317, 2001 WL 568111, at *10 (E.D. La. May 25, 2001).  In *Street*, the plaintiffs sought to certify a putative 23(b)(3) class of individuals denied employment based on the results of an MRI.  *Id.* at *1.  When assessing predominance, the court observed that if the court certified the putative class, it would need to "address the threshold question as to whether the plaintiff and other putative class members are *qualified individuals*, and if not, whether there are any damages at all."  *Id.* at *10 (emphasis added).  To do so, the court explained, "an individualized inquiry would have to be taken as to each such plaintiff."  *Id.*  In a similar vein, the court noted that the individualized damages inquiry also cut against predominance.  *Id.* at *11.  For those reasons, the court held that common issues did not predominate and denied certification.  *Id.* at *10–12.

The same circumstances exist here.  To prevail on their claims for damages, each class member would need to prove (a) that he or she is a qualified individual covered by the strictures of the ADA and (b) his or her individual damages.  If any class member is not a "qualified individual" as defined by the ADA, they will not be able to recover.  This means that an individualized inquiry will be necessary to determine whether each class member is an "individual who, with or without reasonable accommodation, can perform the essential functions of" an alternative available job in the DC government.  *See* 42 U.S.C. § 12111(8).

Furthermore, even if class members are qualified, there is no class-wide method of calculating damages.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (observing that without method to calculate class-wide damages "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class"); *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013) (in predominance context, "district court should consider the extent to which material differences in damages determinations will require individualized inquiries"); *but see Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 761 (D.C. Cir. 2023) (noting that "[e]ven where damages for a putative class action may require individualized calculations, courts have routinely held that those individual considerations do not necessarily preclude certification of a class").  Plaintiffs contend that they have a model that can calculate damages on a class-wide basis by assessing for what positions class members could have been hired as an accommodation, Mem. in Support at 23–24; Reply at 13, but Plaintiffs model cannot answer what salary and job—out of the many available, Mem. in Support at 15—each class member would have been hired for as an accommodation.  Indeed, numerous factors may go into determining which job—out of "at least 6,348 unique job titles (and well over 12,000 jobs)," Mem. in Support at 15—a class member could have been hired to

fill.  *C.f. Burns v. Coca-Cola Enters.*, 222 F.3d 247, 257–58 (6th Cir. 2000) (explaining that

ADA does not require an employer to forsake its usual hiring practices).  Hence, individual

adjudication would be necessary to determine what position—and salary within the position's

salary range—should be used to calculate damages for each class member.  Although the lack of

a method to calculate damages on a class-wide basis is not fatal to predominance, it cuts against

predominance here.  Accordingly, the Court concludes that the common issue of whether MPD's

disability retirement policy violated the ADA does not predominate over the individual issues.

### b.  Superiority

Relatedly, Plaintiffs do not demonstrate that a 23(b)(3) class "is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  When assessing this requirement, Courts must consider: "class members' interests in

individually controlling the prosecution . . . of separate actions"; "the extent and nature of any

litigation concerning the controversy already begun"; "desirability or undesirability of

concentrating the litigation of the claims in the particular forum"; and "the likely difficulties in

managing a class action."  *Id.*

"Class actions are the superior method when they serve the purpose of *efficient resolution

of the claims* or liabilities of many individuals in a single action, as well as the elimination of

repetitious litigation and possibly inconsistent adjudications."  *Aliotta v. Gruenberg*, 237 F.R.D.

4, 13 (D.D.C. 2006) (emphasis added).  As Plaintiffs seem to recognize, even if they can prove

that DC's policy violates the ADA, the Court will likely have to conduct hearings to determine

(a) whether each individual plaintiff is a "qualified individual" covered by the ADA and (b) the

specific damages owed to each class member.  Mem. in Support at 28; Reply at 12.  Such

repetitive hearings would undermine much or all of the efficiency that is the purpose of a class

action.  *C.f. Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 12 (D.D.C. 2002) ("Rule 23(b)(3) favors

class actions where common questions of law or fact permit the court to 'consolidate otherwise

identical actions into *a single efficient unit.*'" (emphasis added and citation omitted)).  Given the

necessity of holding individualized hearings on these two issues it is not clear that a class action

is superior to other methods of adjudication.  *See McCarthy v. Kleindienst*, 741 F.2d 1406, 1415

(D.C. Cir. 1984) ("[S]erious drawbacks to the maintenance of a class action are presented where

individual determinations, such as the issue of liability *vel non*, turn upon highly individualized

facts.").

Moreover, "Courts may infer strong interest on the part of class members in pursuing

their own litigation if the claims asserted 'vitally affect a significant aspect of the lives of the

claimants . . . and there is a wide range of choice of the strategy and tactics of the litigation.'"  1

MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW & PRACTICE § 5:64 (20th ed. 2023)

(cleaned up); *see also id.* at § 5:76 (noting that "the recent trend is against concluding that (b)(3)

class treatment is a superior method of adjudicating employment discrimination claims" because

"individual issues tend to dominate discrimination cases").  Here, whether DC's policy is

enjoined is likely to "vitally affect" class members' lives because it will determine for some

whether they can retain their employment.

Considering the individual inquiries that must be made for individual class members,

class members have a stronger interest in "individually controlling the prosecution" of their

actions and managing the class action would likely be more difficult.  *See* Fed. R. Civ. P. 23(b).

While the parties do not identify other litigation concerning this controversy that is already

underway and there may be a benefit to litigating in this forum, those factors do not outweigh the

difficulty created by the individual questions that predominate here. *Id.* Therefore, the Court

holds that Plaintiffs' proposed class does not satisfy the requirements of Rule 23(b)(3).

### 2. Rule 23(b)(2) Class

The Court next addresses whether a class can be certified under Federal Rule 23(b)(2).

To certify a class under Rule 23(b)(2), the Court must determine whether DC "acted or refused

to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A

Rule 23(b)(2) class is appropriate "when a single injunction or declaratory judgment would

provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. "If a certain outcome is

legally mandated and an injunction provides each member of the class an increased opportunity

to achieve that outcome, Rule 23(b)(2) is satisfied." *Brown*, 928 F.3d at 1082.

Plaintiffs contend that their proposed class satisfies this standard because MPD adopted a

policy applicable to all class members and the Court can issue an injunction or declaratory

judgment with respect to that policy at large. Mem. in Support at 30. DC argues that the Court

should not certify Plaintiffs' class pursuant to 23(b)(2) because it believes that named Plaintiffs

lack standing to pursue injunctive relief. Opp. at 36. This is so, DC says, because Plaintiffs no

longer work for MPD, will not be subject to MPD's involuntary disability retirement policy in

the future, and cannot show that they have a concrete, actual, or imminent injury. Opp. at 37. In

rebuttal, Plaintiffs argue that one of the named plaintiffs—Ms. Mathies—"is interested in

pursuing a D.C. Government 'desk job'—the same kind of job that the District should have

offered to her in lieu of disability retirement" and that she is harmed by DC's failure to provide

her an accommodation. Reply at 23.

Because standing is a "threshold jurisdictional requirement," *Bauer v. Marmara*, 774 F.3d 1026, 1031 (D.C. Cir. 2014), the Court must first assess Plaintiffs' standing before it can address the requirements of 23(b)(2) class certification. In the class action context, only one named plaintiff must have standing to sue in order to maintain the class. *See J.D.*, 925 F.3d at 1324; *Johnson v. District of Columbia*, 248 F.R.D. 46, 56 (D.D.C. 2008). When evaluating whether a plaintiff has standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). To demonstrate Article III standing, a party "must show, first and foremost, injury in the form of invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799–800, (2015) (cleaned up). A "plaintiff must demonstrate standing with respect to each . . . form of relief sought." *Am. Freedom L. Ctr. v. Obama*, 106 F. Supp. 3d 104, 108 (D.D.C. 2015).

Generally speaking, to seek equitable relief, a plaintiff must point to a non-speculative future injury. *See Anatol Zukerman & Charles Krause Reporting*, 64 F.4th 1354, 1362–63 (D.C. Cir. 2023). However, the D.C. Circuit has clarified that, in equitable remedy cases, plaintiffs have standing to seek "injunctive and declaratory relief for [their] *past* injury," provided plaintiffs continue to suffer. *Id.* (emphasis added); *Dearth v. Holder*, 641 F.3d 499, 503 (D.C. Cir. 2011) (holding that plaintiff seeking declaratory and injunctive relief "suffer[ed] continuing, adverse effects sufficient to support standing because the Government denied and continues to deny him the ability to purchase a firearm"); *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 986 (9th Cir. 2007) (a hearing impaired individual not hired by Postal Service due to

hearing impairment supported class standing to sue even when individual was no longer eligible for position desired).

In *Anatol Zukerman*, the plaintiff sued the U.S. Postal Service for declaratory and injunctive relief alleging that the Postal Service violated his rights under the First Amendment by rejecting his customized stamp design based on its partisan message.  *Id.* at 1359–60.  Relying on the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983), the Postal Service argued that the plaintiff lacked standing to seek injunctive relief because the Postal Service no longer maintained the customized stamp program that the plaintiff had tried to use and, therefore, any future injury the plaintiff could face was entirely speculative.  *Id.* at 1362. The D.C. Circuit disagreed with the Postal Service's assessment.  *Id.*

Although the *Anatol Zuckerman* Court acknowledged that the plaintiff could not seek injunctive relief to remedy speculative *future* harms under the Supreme Court's decision in *Lyons*, the Circuit explained that the plaintiff had standing to "sue for the injuries that he had suffered in the past"—even though the Plaintiff sought injunctive and declaratory relief.  *Id.* at 1362–63.  The D.C. Circuit held that it did not matter that the plaintiff would not suffer discrimination by the Postal Service in the future.  *Id.* at 1363 ("[Plaintiff's injury] does not depend on any future discrimination by the Postal Service; after all, the customized postage program has already been shuttered.").  "What matters," the D.C. Circuit stated, is that the plaintiff "was injured the moment the Postal Service refused to print and recognize his stamp" and "[t]he effects of that past injury remain unremedied because the Postal Service continues to officially recognize some outstanding political postage" while the plaintiff never received the stamp he was entitled to receive.  *Id.*  In this way, the D.C. Circuit clarified that, in a suit brought by a plaintiff seeking injunctive and declaratory relief, "past exposure to illegal conduct shows a

present case or controversy sufficient to support standing when accompanied by continuing, present adverse effects." *Id.* (cleaned up).

Such is the case here.  Named Plaintiff Mathies alleges that she was injured the moment DC discriminated against her—in the form of DC's involuntary disability retirement policy—and that she continues to suffer from the present adverse effects of that policy because she has been deprived of the opportunity to work for DC and receive a commensurate salary for that work. *See* Third Compl. at 4–11 (alleging that Plaintiffs desired to continue working for the D.C. government but were involuntarily disability retired despite their desire to continue working and their qualifications for vacant positions), 13–14; Reply at 13–14 (describing economic loss as a result of DC's failure to accommodate).

Like the plaintiff in *Anatol Zuckerman*, Mathies's injury "does not depend on any future conduct at all.  It does not depend on any future discrimination by [MPD]."  64 F.4th at 1363. Rather, Mathies's injury stems from DC's refusal to accommodate her by considering reassignment.  The effects of that past injury remain unremedied because Mathies—as well as the other named Plaintiffs—have not been able to work for DC, despite their entitlement to be considered for an accommodation.  *See id.*; *see also Pickern v. Holiday Quality Foods*, *Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002) (holding that disabled plaintiff facing access barriers suffered from disability discrimination and had standing to sue for injunctive relief).  Moreover, Mathies would still like to work for DC, but was not afforded an accommodation.  Reply at 23.  Because Mathies's "past injur[ies] remain unremedied," she has suffered the requisite injury to confer standing as required by Article III.  *Anatol Zuckerman*, 64 F.4th at 1363; *see also Dearth*, 641

F.3d at 136–37 (plaintiff previously denied a firearm permit alleged a present cognizable injury rather than indefinite future harm because government scheme thwarted his rights).[7]

Because Plaintiffs have standing, the Court moves on to address whether Plaintiffs satisfy the requirements of Federal Rule 23(b)(2).  In addition to its challenge to Plaintiffs' standing, DC argues that the Court should not certify Plaintiffs' 23(b)(2) class because Plaintiffs cannot show that MPD "acted . . . on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2); *see* Opp. at 39–40.  Specifically, Defendants contend that an injunction "would only be the first step in a highly individualized process to determine the appropriate remedy for each class member."  Opp. at 40.  But this argument fails as well.  While it is true that MPD may eventually be required to make individual determinations to assess whether disabled officers are qualified individuals under the ADA and assess what accommodations are reasonable, that necessity does not render a Rule 23(b)(2) class inappropriate.  *See, e.g.*, *Astrue*, 250 F.R.D. at 487 ("[T]he individualized determination referenced by this court is one that *the agency* . . . is required to make under the Rehabilitation Act in considering the particular needs of its beneficiaries.  *This court* need not make any individualized determinations." (emphasis added)).

As explained above, a 23(b)(2) class is available when "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  For instance, in *Thorpe*, the court held that "[f]or purposes of satisfying Rule 23(b)(2)," it was sufficient that the plaintiffs had "proffered evidence of systemic deficiencies in

---

[7] Having concluded that Plaintiff Mathies has standing, the Court need not determine whether other named Plaintiffs have standing.  *See J.D.*, 925 F.3d at 1324.  The Court observes, however, that the other named Plaintiffs were also deprived of an accommodation—thereby suffering an injury—and equitable relief may afford them a remedy.  *See Anatol Zuckerman*, 64 F.4th at 1363, 1365–66 (granting plaintiff declaratory relief after finding injunctive relief inappropriate).

the District's system" of transitioning disabled nursing facility residents to long-term care services, in violation of the ADA.  303 F.R.D. at 151.  The court reasoned that addressing the deficiencies in the District's program would not require individualized relief and thus an injunction or declaratory judgment could apply to the class as a whole.  *Id.* at 151–52.  Similarly, in *Astrue* the court explained that "for a class to be certified under Rule 23(b)(2), it is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole, even if some class members have not been injured by the challenged practice."  250 F.R.D. at 491 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (internal quotation marks omitted)).[8]

Here, equitable relief can apply to the class as a whole—as well as to the proposed subclasses.  *See Thorpe*, 303 F.R.D. at 151 ("District's alleged failure to implement an effective [policy required by ADA] is obviously an action or inaction that 'can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" (citation omitted)); *Lacy*, 897 F.3d at 865–66 (holding that 23(b)(2) class was appropriate where plaintiffs "all complain[ed] about the same failure to implement and enforce policies" that would accommodate their disabilities as required by ADA); *Nio v. U.S. Dep't of Homeland Sec.*, 323 F.R.D. 28, 34 (D.D.C. 2017) (holding that plaintiffs' proposed class met the requirements of 23(b)(2) even though government would be required to make individualized determinations

---

[8] The Court observes that 23(b)(2) was specifically "intended to reach situations where a party has . . . refused to take action with respect to a class" such as "where a party is charged with discriminating unlawfully against a class."  *See* Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment; *see also Brown*, 928 F.3d at 1083 ("The Supreme Court has called civil rights cases against parties charged with unlawful, class-based discrimination like this [ADA case], prime examples of what (b)(2) is meant to capture." (cleaned up)); 1 McLaughlin, McLaughlin on Class Actions: Law & Practice § 5:76 (20th ed. 2023) (noting that "the trend in employment [discrimination] actions is toward certification . . . under (b)(2)").

because plaintiffs were only challenging the application of standardized policies that generally applied to the class).  For instance, a declaratory judgment holding that MPD's policy violated the ADA could provide relief to the entire class—both the members who were involuntarily retired pursuant to that policy and the members who are currently subject to the policy.  An injunction requiring MPD to assess whether it can accommodate disabled officers in lieu of involuntary retirement also would benefit every police officer subject to MPD's disability retirement policy.

Moreover, both subclasses were impacted by DC's failure to consider providing an accommodation in lieu of retirement.  *See* Mem. in Support at 9–12 (noting deficiencies in DC's disability retirement policy both before and after 2017); *id.* at 10 ("Prior to mid-2017, MPD not only lacked a written policy on ADA accommodations but also lacked an 'effective system' for engaging in the interactive process with officers who were on Limited Duty or sick leave."); *id.* at 12 ("Although MPD published its ADA Policy, 'MPD has not made changes to its process to make that policy a reality.'").  If Plaintiffs prevail in obtaining equitable relief in this case, such relief will not require a "different injunction or declaratory judgment against the defendant" for each class member.  *See Wal-Mart*, 564 U.S. at 360.  Rather, the Court could issue one injunction or declaratory judgment applicable to DC's policy.  Accordingly, the Court holds that Plaintiffs have satisfied the requirements of 23(b)(2) and certifies Plaintiffs' proposed class and subclasses under that provision.

\* \* \*

Lastly, the Court determines that Plaintiffs' class counsel— Brown Goldstein & Levy, LLP and Mehri & Skalet, PLLC—satisfy the requirements for the appointment of class counsel under Federal Rule 23(g).  Plaintiffs' counsel have worked diligently to identify and investigate

potential claims, state that they have experience handling class actions and the types of claims asserted in this action, understand the law applicable in this action, and have already expended significant resources in representing the class.  Mem. in Support at 31.  Moreover, no other counsel has sought to represent the class here and DC does not present a counter argument to counsel's appointment.  Accordingly, the Court appoints Plaintiffs' counsel as class counsel.[9]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Certify a Class and Appoint Class Counsel (ECF. No. 62) is **GRANTED** in part and **DENIED** in Part.  Additionally, Defendants' Motion to Strike (ECF No. 74) is **DENIED** as **MOOT**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 14, 2024                                   RUDOLPH CONTRERAS
                                                                  United States District Judge

---

[9] DC has also filed a motion to strike 13 declarations of proposed class members submitted by Plaintiffs as attachments to their reply brief in support of their motion to certify.  *See* Motion to Strike, ECF No. 74.  Plaintiffs cite the declarations that are the subject of Defendant's motion in support of Plaintiffs' commonality and standing arguments.  *See* Reply at 17, 23.  These declarations, however, do not affect the Court's analysis.  With respect to standing, as explained above, "[i]n the class action context, standing depends on the *representative* plaintiffs," not the class members.  *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 191 (D.D.C. 2013) (emphasis added).  Nor does the Court's commonality analysis hinge on the 13 declarations.  Because the Court would reach the same holding irrespective of whether the Court considered the 13 declarations submitted by Plaintiffs, DC's motion to strike no longer presents a live controversy.  Accordingly, the Court denies the motion to strike as moot. *McBryde v. Comm. To Review Cir. Council Conduct Disability Ord. of the Jud. Conf. of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001); *see, e.g.*, *Schubarth v. Fed. Republic of Germany*, 220 F. Supp. 3d 111, 116 (D.D.C. 2016) (denying motion to strike as moot where court did not consider materials that were subject of motion).